FILED by __ D.C.
ELECTRONIC

Apr. 30, 2009

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. - MIAMI

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

## 09-60637-Civ-HUCK/O'SULLIVAN

Case No. _____ – Civ – (_____)

|  |  |
|---|---|
| **SUNBEAM TELEVISION CORP.,**<br>**Plaintiff,**<br><br>v.<br><br>**NIELSEN MEDIA RESEARCH, INC.,**<br>**Defendant.** | **Jury Trial Demanded** |

## COMPLAINT

Plaintiff Sunbeam Television Corp. ("Sunbeam") brings this action for treble damages, attorneys' fees, costs of suit and injunctive relief against defendant Nielsen Media Research, Inc. ("Nielsen"). Nielsen's conduct complained of herein violates federal and state antitrust laws, violates Florida's unfair trade practices laws, and constitutes a breach of Nielsen's contract with Sunbeam. In support of these claims, Sunbeam alleges as follows:

## INTRODUCTION AND SUMMARY OF CLAIMS

1.  Defendant Nielsen provides television audience measurement services, commonly referred to as television "ratings," in the United States generally and specifically in the Miami-Fort Lauderdale local television market in which Sunbeam operates WSVN-TV ("WSVN"). Because it is the only provider of television audience measurement services in these markets, Nielsen enjoys a monopoly position unconstrained by competition. Nielsen's services are

essential to broadcast television stations such as WSVN, which cannot effectively price or sell advertising time without them.

2.     Sunbeam's antitrust and unfair competition claims arise out of (1) exclusionary conduct by Nielsen designed, intended and having the effect of maintaining and perpetuating its monopoly; and (2) various abuses by Nielsen of its monopoly position that have caused Sunbeam serious antitrust injury.

3.     The exclusionary acts that have enabled Nielsen to maintain its monopoly position include: (1) mandating contract provisions that prevent competitors from entering the market; (2) undertaking transactions intended to neutralize actual or potential competitors and prevent competitive technologies and services from entering the market; (3) imposing punitive pricing on customers who resist its abusive practices; and (4) utilizing defective ratings data to attract and retain new customers, thereby foreclosing a potential avenue of entry and further cementing its position as the sole supplier of audience measurement services.

4.     Having successfully excluded competition, Nielsen has abused its monopoly power in several ways. First, it has charged its captive customers, including Sunbeam, much higher prices – for fewer services – than would exist in a competitive market. Unchecked by competition for years, Nielsen has increased its pricing with impunity to customers who have had nowhere else to turn, and required them to purchase *a la carte* services that were previously included without additional charge. In 2008, Nielsen increased the price of its services related to Sunbeam's WSVN station by 20%.

5.     Nielsen also has maintained and abused its monopoly position by imposing on its customers onerous contract provisions that, among other things, purport to leave them with no

2

effective contractual recourse against Nielsen, even when Nielsen's improper actions have seriously damaged its customers.

6.      Finally, Nielsen has abused its monopoly position by forcing on its customers poorly implemented data collection systems and statistically unsound sampling that have produced defective ratings data. On October 1, 2008, over the objection of its television station customers in the Miami-Fort Lauderdale market, Nielsen unilaterally replaced its traditional Meter-Diary data collection system with a technology known as Local People Meters ("LPMs"). Although Nielsen falsely and deceptively touts LPMs as an improved technology that provides accurate ratings data, in fact there are serious problems with LPMs that are well-known to Nielsen. For example, it is well-established from Nielsen's prior implementations of LPMs in other large and complex urban markets that LPMs significantly undercount minority viewers and other demographic groups, in large part because Nielsen consistently has failed to provide the rigorous sampling, training, testing and other safeguards necessitated by the LPM technology. Indeed, Nielsen's implementation of LPMs in urban markets has been the subject of widespread criticism from its customers, minority groups, advertisers and even Congressional leaders. The industry accreditation agency has urged Nielsen to take necessary steps to ensure the accuracy of LPMs and obtain accreditation *before* rolling out LPMs in new markets. Despite these warnings, Nielsen did not obtain accreditation or take other steps necessary to ensure accuracy before rolling out LPMs in the Miami-Fort Lauderdale market, even though Nielsen itself has acknowledged that Miami-Fort Lauderdale is the most demographically diverse and complex of all LPM markets, and therefore especially susceptible to the shortcomings of LPMs.

3

7.    Predictably, Nielsen's imposition of the LPMs in the Miami-Fort Lauderdale market has been an unmitigated disaster for its broadcast television customers there. From the outset, Nielsen's LPMs produced defective, wildly inaccurate ratings data which – literally overnight –created havoc in the market. For a significant amount of WSVN's programming, Nielsen's LPM system produced audience data that differs significantly from the audience data Nielsen's prior system consistently produced, cannot be reconciled with the realities of the market, and erroneously suggest the overnight disappearance of a vast portion of WSVN's audience. One of many examples is WSVN's late newscast. For more than 10 years prior to October 1, 2008, WSVN's 10:00 p.m. newscast was, according to Nielsen's own data, by far the highest rated late newscast in the Miami-Fort Lauderdale market. Before LPMs were implemented this program consistently garnered ratings of over 4 (corresponding to greater than 4% of the viewers) in the critical 25-54 year-old demographic group, reflecting a viewership of more than 60,000 people from that demographic. WSVN's ratings for persons 25-54 for this newscast plunged to 1.8 immediately after Nielsen introduced LPMs to the market, falsely suggesting that more than 50% of this program's 25-54 year-old viewers, or more than 30,000 people, simply stopped watching this newscast overnight. Because advertising revenues are tied to ratings, WSVN's revenues for this newscast have diminished by approximately 50% – or approximately $6 million annually – since Nielsen implemented LPMs in the Miami-Fort Lauderdale market.

8.    Another stark example of the failure of LPMs in the Miami-Fort Lauderdale market is the otherwise inexplicable drop in Nielsen's reported viewership for American Idol since LPMs were introduced in October 2008. Prior to that time, Miami-Fort Lauderdale was

4

generally understood to be one of the strongest markets for American Idol, and Nielsen's own ratings consistently supported that fact.   By contrast, Nielsen's LPM data produced ratings suggesting a much smaller viewership, placing Miami-Fort Lauderdale among the weakest markets for American Idol.   For example, in the all-important February sweep report, Nielsen reported a 29.3% drop in household ratings[1] for the Tuesday episode of American Idol from 2008 (13.0 in 2009 vs. 18.4 in 2008), and a 37.1% drop in the critical 25-54 demographic ratings (8.8 in 2009 vs. 14.0 in 2008).   The Wednesday episode of American Idol saw similar declines – a 27% drop in household ratings and a 42.5% drop in ratings for persons 25-54.   After consistently being a leading market for American Idol, Nielsen's LPM-based 2009 ratings for persons 25-54 place Miami-Fort Lauderdale *very last* among the top-20 markets.   These results are obviously—and dramatically—defective, and yet Nielsen continues to defend its system and refuses to fix it.   In the absence of competitive alternatives, it has not been required to.

9.    Nielsen's hasty implementation of LPMs in urban markets is part of its strategy to capture local cable customers.   In general, LPMs produce higher cable ratings and lower broadcast ratings than Nielsen's previous methods.   Nielsen has rolled out LPMs in order to attract and lock in cable providers, enabling Nielsen to gain control of these new customers and thereby further inhibit entry by potential competitors.    In doing so without obtaining accreditation or otherwise ensuring the accuracy of LPMs, Nielsen has pursued this strategy at the expense of its broadcast television customers like WSVN.

---

[1] Live plus DVR viewing data.

5

10.   Nielsen's abuse of its monopoly position caused Senator Conrad Burns, who led a Congressional inquiry into Nielsen's defective rollout of LPMs in major urban markets, to comment:

> It is this pattern of behavior that has alarmed me, many other members of Congress, and a significant number of experienced media and advertising industry players:  The rapid rollout of a system with well-known flaws to new markets before the problems are fixed where they exist.  This pattern . . . suggests a tendency to place Nielsen's private interest above the public interest, which is the accuracy of TV ratings for all viewers, regardless of race, and a disregard for the critical role of the MRC in certifying new measurement technologies.[2]

11.   Nielsen's delivery of defective ratings data also violates the terms of the Nielsen Station Index Service Agreement with Sunbeam ("Sunbeam/Nielsen contract"), a true copy of which is attached as Exhibit A.  While Nielsen has incorporated into its contracts with its customers (including Sunbeam) provisions that purport to limit significantly its obligations and liability, such provisions are unenforceable as they are a direct result of Nielsen's abuse of its monopoly power.

12.   Nielsen's unlawful conduct has cost Sunbeam approximately $1 million per month in advertising revenues, and reduced the going concern value of WSVN by at least $100 million.

13.   Nielsen's unlawful conduct must be stopped to prevent future harm to Sunbeam and other market participants, including other broadcast stations, advertisers, media sales representatives, and viewers, particularly minority viewers, whose market presence is being systematically undervalued by Nielsen, and to allow free and fair competition to dictate the prices and products made available in the market for television audience measurement services.

---

[2]  Letter from Senator Conrad A. Burns to Deborah Majoras, Chairman, Federal Trade Commission (April 6, 2005) (available at www.rbr.com/epaper/pdfs/BurnsMajorasLetter.pdf).

6

Nielsen's anticompetitive conduct is illegal under section 2 of the Sherman Act and section 542.19 of the Florida Antitrust Act. In addition, Nielsen's unfair and oppressive conduct violates section 501.204 of the Florida Deceptive and Unfair Trade Practices Act. Lastly, Nielsen's conduct constitutes a material breach of the Sunbeam/Nielsen contract, as well as a breach of its implied covenant of good faith and fair dealing. Sunbeam seeks declaratory and injunctive relief, prohibiting future violations by Nielsen of the Sherman Act, the Florida Antitrust Act, and the Florida Deceptive and Unfair Trade Practices Act. Sunbeam also seeks damages on all counts in an amount to be proved at trial, including treble damages with respect to its antitrust claims.

## PARTIES

14.    Plaintiff Sunbeam is a for-profit corporation organized and existing under the laws of the state of Florida, whose principal places of business are in Miami, Florida and Boston, Massachusetts. Sunbeam operates three television stations, WSVN in the Miami-Fort Lauderdale, Florida market and WHDH and WLVI in the Boston, Massachusetts market. WSVN is an affiliate of Fox; WHDH is an affiliate of NBC; and WLVI is an affiliate of the CW network.

15.    Defendant Nielsen is a for-profit corporation organized and existing under the laws of the state of Delaware, whose principal place of business is in New York, New York. It is a wholly-owned subsidiary of The Nielsen Company, a privately-held company based in Haarlem, the Netherlands and New York, New York.

7

## JURISDICTION AND VENUE

16.     Sunbeam seeks relief under section 16 of the Clayton Act, 15 U.S.C. § 26, to prevent and restrain violations of the Sherman Act, 15 U.S.C. § 2, treble damages and the costs of suit, including reasonable attorneys' fees under section 4 of the Clayton Act, 15 U.S.C. § 15, and relief under the Florida Antitrust Act, Fla. Stat. § 542.19, the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201, *et seq.*, and under common law.

17.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1337, 2201 and 2202.  This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

18.     Nielsen has a large base of operations in Oldsmar, Florida.  Venue in this District is proper pursuant to 28 U.S.C. § 1391 and 15 U.S.C. § 22 because Nielsen resides in and transacts business in this District and a substantial portion of the affected interstate trade and commerce described herein was carried out in this District.  The acts complained of have had, and will continue to have, substantial anticompetitive effects in this District.

## RELEVANT MARKETS

19.     Sunbeam operates WSVN in the Miami-Fort Lauderdale market, a geographic market that is well-recognized in the television, audience measurement and advertising industries.  The Relevant Markets consist of television audience measurement services in the Miami-Fort Lauderdale area and nationwide.  The antitrust and other injuries that Sunbeam claims in this complaint arise out of Nielsen's unlawful actions taking place and/or having their effect in the Miami-Fort Lauderdale market.  Nielsen also monopolizes the markets for television audience measurement services nationally, and in more than 200 local television markets in

8

addition to Miami-Fort Lauderdale. Nielsen's unlawful conduct with respect to the Miami-Fort Lauderdale market is consistent with and a continuation of its ongoing efforts to exclude competition and perpetuate its monopoly in all of these markets, and to abuse its unlawfully maintained monopoly position.

## TRADE AND INTERSTATE COMMERCE INVOLVED

20.    The trade and interstate commerce relevant to this action is the provision of television audience measurement services.

21.    Nielsen participates in the sale of television audience measurement services across state lines directly or through affiliates or subsidiaries.

22.    Nielsen's activities have excluded competition and restrained trade in the Relevant Markets and have directly and adversely affected Sunbeam's ability to obtain high quality, reasonably accurate television audience measurement data at competitive prices. This, in turn, directly and adversely has affected Sunbeam's ability to sell advertising time at prices that accurately reflect its actual value to advertisers.

## FACTUAL ALLEGATIONS

### *Television Stations and Other Market Participants Are Dependent Upon Television Ratings.*

23.    More than $60 billion was spent last year on television advertising time in the United States. The bulk of local television stations' revenues come from the sale of air time to advertisers.

24.    Television ratings are essential to the operation of the television and television advertising industries. Television ratings help television stations determine which television

9

shows to air and when, and they greatly influence advertisers' choices about where and when to place advertising and how much to pay for advertising time.

25.   Local television stations must purchase television ratings services in order to effectively participate in the market for advertising sales.  If a station does not purchase ratings data, advertisers and advertising agencies either will not purchase advertising time from that station, or will pay significantly less for it.  For years, Nielsen has been the only provider of television ratings services in the television markets in which Sunbeam operates television stations.

*The Television Industry Depends Upon the Accuracy of Ratings and Provides an Accreditation Process to Ensure Their Accuracy.*

26.   Given the significance of television audience measurement data and its impact on both television programming and the multi-billion dollar advertising industry, Congress has evaluated whether companies providing television audience measurement services should be regulated.  The television ratings scandals in the 1960s caused Congress to convene the Harris Committee Hearings on Broadcast Ratings to consider this issue.  The Harris Committee ultimately determined that industry self-regulation, including independent audits of rating services, was preferable to government intervention.

27.   Following the Harris Committee Hearings, the Broadcast Ratings Council, which is now called the Media Ratings Council (the "MRC"), was established to review and accredit audience measurement services.  The MRC is a non-profit, independent, industry-run, private oversight body.  The activities of the MRC include, among other things:  (a) the establishment and administration of minimum standards for rating operations; (b) the accreditation of audience

10

measurement services on the basis of information submitted by the services; and (c) auditing, through independent accounting firms, the activities of the measurement services.

28.    MRC accreditation is not mandatory.  If an audience measurement service seeks accreditation, the MRC engages an independent accounting firm to conduct a detailed audit of the ratings service.  The accounting firm then produces an audit report on the measurement service, which includes detailed testing and findings for: sample design, selection and recruitment; sample composition and demographic groups; data collection and fieldwork; metering, diary or interviewing accuracy; editing and tabulation procedures; data processing; ratings calculations; and assessment of the measurement service's disclosures of methodology and survey performance.  These steps are necessary because extrapolating estimated audience ratings from an inadequate or non-representative sample or by inaccurate data collection technology and tabulation methodologies will result in misrepresentative, and potentially inaccurate, demographic results.

### Nielsen Has Monopolized the Markets for Television Ratings in the United States for Nearly Two Decades.

29.    Nielsen effectively is the sole source of ratings for television audiences nationwide and in over 200 local markets (including Miami-Fort Lauderdale) across the U.S.  In the early 1990s, Arbitron, Nielsen's only real competitor, exited the television ratings industry after competing successfully with Nielsen for over three decades.

30.    Nielsen's monopoly in the market for television ratings gives it the power to control price, output and quality.  As a result of its monopoly, Nielsen is able to charge supracompetitive prices for poor quality services.

11

31.     Nielsen acknowledged its monopoly position.  Nielsen's parent company stated in public filings that Nielsen's "audience estimates are widely accepted as the 'currency' for both buyers and sellers of U.S. television advertising, an industry that had over $62 billion of annual expenditures in 2006 according to the PricewaterhouseCoopers Global Entertainment & Media Outlook."[3]

32.     Industry participants and commentators routinely describe Nielsen as a monopolist. For example, the Independent Task Force on Television Measurement concluded in its 2005 Report that Nielsen "is the only real source for vital television viewer data. . . ."[4]  In 2005, Senator Conrad Burns, then-Chairman of the Senate Commerce Committee, described Nielsen as "an unregulated, or at best partially-regulated, private monopoly provider" of television ratings,[5] and a 2004 U.S. News & World Report article quotes a "top network executive" as saying that "[t]he industry absolutely loves to hate Nielsen for being a monopoly. . . ."[6]  Similarly, a BusinessWeek article cites "incontrovertible evidence that [Nielsen's] lucrative monopoly is intact."[7]

**_Nielsen Has Engaged in a Range of Exclusionary Conduct To Maintain Its Monopoly._**

33.     In order to maintain and perpetuate its monopoly position, to the detriment of its customers and other market participants, Nielsen engages in a range of unlawful exclusionary conduct to prevent competitors from entering the market.

---

[3] The Nielsen Company B.V., Form 10-K, at 11 (Dec. 31, 2007).

[4] _Report of the Task Force on Television Measurement_, at 10 (March 2005).

[5] Letter from Senator Conrad A. Burns to Deborah Majoras, Chairman, Federal Trade Commission (April 6, 2005) (available at www.rbr.com/epaper/pdfs/BurnsMajorasLetter.pdf).

[6] Betsy Streisand, _The Tracker Behind the Tube_, U.S. NEWS & WORLD REPORT, Oct. 31, 2004.

[7] Anthony Bianco & Ronald Grover, _How Nielsen Stood Up to Murdoch_, BUSINESSWEEK, Sept. 20, 2004.

12

### A. Nielsen foists on its customers one-sided contract terms that inhibit them from seeking competitive alternatives.

34.    As a result of and in order to maintain and perpetuate its monopoly position, Nielsen imposes upon its customers a range of contractual terms designed, intended and having the effect of excluding competition and impairing entry into the market. Nielsen would not be able to impose these terms in a competitive market.

35.    Nielsen requires its customers to enter into multi-year agreements and imposes steep financial penalties on customers who refuse. These contracts typically have terms of four to seven years. In the case of Sunbeam, Nielsen required a contract term of five years. By locking its television station customers into long term contracts, Nielsen impairs their ability to seek alternative rating service providers, and correspondingly impairs the ability of potential competitors to enter the audience measurement services market.

36.    Nielsen also staggers the termination dates of its major client service contracts in national and local markets. By staggering its customers' contract terms, Nielsen impairs the ability of competitors to enter because a potential entrant would need to secure a critical mass of television station customers in a given television market in order to succeed, and is prevented from doing so by Nielsen's staggered contract scheme.

37.    Nielsen refuses to grant some or all of its customers, including Sunbeam, the right to terminate their contracts with Nielsen during the contract term even though Nielsen retains the right to terminate such contracts under various circumstances. By locking its customers into long-term, non-cancellable contracts, Nielsen reduces its customers' ability to seek competitive alternatives and deters entry by potential competitors.

13

38.     Nielsen coerces its customers into renewing their agreements by including a provision in its standard agreement that allows Nielsen to demand the return of all information, data, and other materials provided by Nielsen to the customer during the expiring contract term.

### B. Nielsen punishes customers who do not acquiesce to its terms.

39.     Nielsen demands higher prices from potential customers who refuse to enter into long term contractual arrangements with Nielsen.

40.     Nielsen gives preferential pricing to customers in local markets who are first to agree to purchase Nielsen's services. Nielsen thereby seeks to punish television stations that balk at Nielsen's onerous contract terms or attempt to hold out from purchasing Nielsen's services.

### C. Nielsen aggressively impedes threats to its monopoly by co-opting potential competitors.

41.     Nielsen has an established history of blocking competition either by introducing services similar to those proposed by its potential competitors, by acquiring potential competitors, or by entering into business arrangements that hinder competition and innovation.

42.     In the 1980s, Nielsen did not begin to implement people meter technology into its national sample until AGB Research PLC, a British ratings company, attempted to enter with a similar meter.

43.     In 1995, at the behest of television industry executives who were frustrated by Nielsen's antiquated technology, Statistical Research, Inc. actively was developing television measurement methods that could compete with Nielsen. In response, Nielsen announced its intention to introduce modernized meters. After Statistical Research, Inc.'s ratings laboratory exited, however, Nielsen significantly delayed the introduction of its new meters.

14

44.     Nielsen's exclusionary practices have blocked other companies that attempted to enter the U.S. television audience measurement market.     As a 1999 article in *American Demographics* noted, there is a "trail of . . . failed attempts to launch a Nielsen competitor – including efforts by Television Audience Assessment, AGB, R.D. Percy & Co. and Arbitron's ScanAmerica."[8] AGB Research PLC, a British ratings company, attempted to enter the U.S. in the late 1980s.     Similarly, in the mid-2000s, erinMedia, LLC attempted to launch a new measurement methodology designed to measure cable viewership, but was blocked by Nielsen's exclusionary conduct.

45.     When Arbitron developed the PPM methodology (see paragraph 49, below), Nielsen entered into various financial and contractual relationships with Arbitron relating to the technology.  Nielsen entered into an agreement with Arbitron in 2000 to test PPMs in local U.S. markets and to explore a joint venture between the two companies to deploy PPMs for local television measurement.  By these means, Nielsen assured itself control over whether, how and when PPM technology would be deployed in the U.S.  PPMs still have not been offered in U.S. markets as a competitive alternative to Nielsen's television ratings technology.

46.     Nielsen's anticompetitive conduct prevented these companies and others from gaining a foothold in the Relevant Markets.

### D. Nielsen's exclusion of potential competitors has limited innovation and eliminated competitive discipline over price and quality.

47.     In the absence of competition, Nielsen has been slow to introduce innovation in television audience measurement.

---

[8] Joe Mandese, *They Didn't Get SMART: The Television Industry Looks to Digital Measurement*, AMERICAN DEMOGRAPHICS, Aug. 1999.

48.     Prior to exiting from the U.S. television audience measurement business, Arbitron competed with Nielsen on price and quality.   According to a report on the website of the Museum of Broadcast Communications, Arbitron "was usually considered the innovative force, normally reacting quickly to what the ad agencies needed. . . ."   Immediately before Arbitron exited the television audience measurement business in the U.S. in the early 1990s, approximately 275 stations subscribed to both Arbitron's and Nielsen's local market reports.[9]

49.     Arbitron continues to develop television audience measurement methods and technologies, that are not available in the U.S.   For example, in 2004, BBM Canada, the Canadian industry consortium for audience ratings, adopted Arbitron's new technology – the Personal People Meter ("PPM") product – as the official ratings system for buying and selling commercial airtime on French-language television in Quebec and Montreal.[10]   PPMs are small, passive measurement devices that individuals participating in representative samples wear or carry throughout the day to measure viewership inside and outside of the home.   PPMs monitor codes embedded in the audio of television programs, allowing them to track viewership without any input by the viewer, a feature not available to Nielsen's sample participants in major local markets.   Arbitron also has partnered with TNS, a leading European and Asian provider of television audience measurement services, to market the PPM technology.

50.     Nielsen does not offer a product to measure out-of-home viewership in local markets, and each of Nielsen's methodologies requires active participation by sample participants.

_____

[9] *Id.*

[10] *BBM Canada First to Adopt Arbitron Portable People Meter for TV Ratings*, July 21, 2004 (available at http://www.onlinepressroom.net/arbitron).

16

51.    PPMs still have not been offered in the U.S. as a competitive alternative to Nielsen's television ratings technology.  Instead, Nielsen continues to tout its non-passive and faulty LPM systems as innovation, despite the fact that the technology is more than 20 years old and lags significantly behind the passive systems used in Europe and Canada.

52.    In the absence of competition, Nielsen can and does dismiss with impunity legitimate criticisms and concerns about the price, quality and reliability of its audience measurement services, and ignores the recommendation of the MRC and others that it take steps to address the faulty ratings data produced by its LPMs.

**Nielsen's Monopoly Enables It to Impose on Its Customers a Poorly Implemented, Inaccurate Ratings System.**

### A. Under the guise of innovation, Nielsen implemented a seriously flawed ratings system in the nation's largest local television markets.

53.    For more than forty years, Nielsen has generated ratings data in major local television markets by utilizing the so-called Meter-Diary System.  The Meter-Diary System gathers television usage data by installing meters in participating households that track the channels to which each television is tuned and how long the television is tuned to that channel. This electronic household data, which is processed daily, is supplemented several times a year – during "sweeps" periods – by demographic viewing data that is collected from a separate sampling of market residents who record what they watch on television in a paper diary for a one-week interval.  The Meter-Diary System is accredited by the MRC for local ratings.

54.    Although people-meter technology has been available for decades, Nielsen did not begin to implement this technology in local markets until it recognized that local LPMs would enable it to capture previously untapped local cable providers.  Thus, beginning in the early

17

2000s, Nielsen began implementing a strategy to replace the MRC-accredited Meter-Diary Systems with Nielsen's LPM technology in the largest local television markets in the United States.

56.     LPMs are box-like devices, attached to each television in a home, which constantly monitor the status of each television set. The LPM system differs from the Meter-Diary system in that it includes a remote control device to track which household members are watching each television in the home at a given time. The LPM remote control contains a different personal viewing button for each member of the participating household, which identifies that person by age and gender. Whenever any television in the home is turned on, a light intermittently flashes on the LPM, prompting the viewer to press his/her assigned button to indicate who is watching the television. Thus, LPMs provide a mechanism for Nielsen to collect usage and demographic viewing data from a single sampling of market residents. Unlike the Meter-Diary system, Nielsen can collect data from the same LPM participants for up to 5 years, reducing Nielsen's costs of data collection. Additionally, LPMs allow Nielsen to produce demographic data on a daily basis, whereas demographic data collected using the Meter-Diary system is available only during sweep periods (four to seven times a year depending on the size of the market).

56.     Although the LPM technology has the *potential* to compile ratings data accurately, its accuracy depends on proper sample size, selection and recruitment techniques, as well as training and monitoring sample participants carefully to prevent large fault rates. Moreover, unlike Arbitron's PPM system, LPM survey participants must accurately and actively use their remote controls, lest Nielsen's LPM data be incomplete or incorrect, and thus inaccurate.

18

57.     Nielsen has failed to take steps to ensure that its sample size, selection, recruitment and training of LPM sample participants are sufficient to ensure reasonably accurate television audience measurements in diverse urban markets.

58.     Nielsen's hasty implementation of LPM systems, particularly in diverse urban markets, has resulted in flawed audience measurement data that substantially undercount minority viewership.

### B.   LPMs enable Nielsen to capture previously untapped local cable providers, which motivates Nielsen to implement LPMs in urban markets without accreditation or the necessary quality controls.

59.     For decades, the affiliates of the country's major television networks have been Nielsen's principal customers in local television markets.  Local cable providers historically did not purchase Nielsen's services due to the cost of Nielsen's services in relation to the cable systems' potential advertising revenues.  Often, the parent cable networks (*e.g.,* ESPN, TBS) limited or disallowed the insertion of local advertising by local cable operators, or multi-service operators ("MSOs").  Moreover, the MSOs audience was generally smaller and more parochial than that of the broadcast stations.  Uninterested in advertising on a station that reached relatively few viewers, large national advertisers rarely purchased air time from local cable operators.  Additionally, the cost of the facilities and technology to traffic and insert advertising was prohibitively expensive for local cable systems, and thus ratings data were not essential to their revenue stream, which was primarily subscription supported.

60.     In the late 1990s the local cable landscape changed dramatically.  Smaller MSOs began to form regional cable interconnects, which enabled cable stations to sell advertising time across an entire television market area, rather than for a single MSO.  Participating in

19

interconnects permitted cable systems to market their advertising airtime to larger national advertisers who could pay more for advertising time than small local companies. As a result, by the late 1990s cable companies wanted Nielsen's ratings data and could afford to pay for it.

61.     However, the collection of local cable ratings data under the Meter-Diary system remained problematic. The number of cable channels and programs offered led to some mis-reporting of cable viewing by diary keepers. Thus, despite the known flaws with LPMs, cable systems anticipated better ratings once the LPMs were implemented and the Meter-Diary system was eliminated. Accordingly, without first correcting the LPM systems' flaws, Nielsen hastily implemented the LPM system in the country's largest local markets in order to expand its sales to MSOs.

62.     For example, during a year-long "test period" prior to launching the first LPM system in Boston in 2002, Nielsen reported daily audience estimates from both the Meter-Diary and LPM systems. Nielsen produced "test" LPM data that reflected higher ratings for cable systems. The cable system operators in Boston knew that, after Nielsen launched its LPM system and simultaneously shut down the Meter-Diary system, ratings derived from LPM data would be the only data available in the Boston market. As a result, AT&T Broadband and various major cable systems in Boston signed long-term contracts to purchase the LPM service from Nielsen even before Nielsen officially launched the Boston LPM system in May 2002.

63.     By replacing Meter-Diary systems with LPM systems in major markets, Nielsen automatically increases MSOs' demand for its services in that local market because the LPM systems report a greater number of cable viewers.

20

64.     Nielsen has a history of using its monopoly position to produce ratings data that favor a potential customer it is courting to the detriment and expense of its existing customer base. In the Miami-Fort Lauderdale market, Nielsen has two television rating services: one for monolingual Spanish speaking stations, and another for all stations, including Spanish speaking households. Since about 1995, Nielsen has added the sample households for its Spanish speaking service to the sample it uses for all households, resulting in an over-representation of the monolingual Spanish speaking households. Predictably, this overweighting improved the ratings of the Spanish speaking stations, but at the expense of the English speaking stations, including WSVN. Nielsen thereby enhanced its profitability by selling a second service to the Spanish speaking stations. While Nielsen overweights the monolingual Spanish speaking households, the bilingual households are under-sampled to the further disadvantage of WSVN, which has a large bilingual audience.

### C. Nielsen has been aware for years that LPMs produce inaccurate ratings in urban markets, in part due to their tendency to undercount minority viewers.

65.     Nielsen launched its first LPM system in Boston in 2002. Contemporaneously, the MRC conducted an extensive audit of the system and refused to accredit it owing to serious concerns about the efficacy of the service. Nevertheless, Nielsen forged ahead and implemented the LPM system in Boston.

66.     Testifying before the Senate Commerce Committee in 2005, the Executive Director of the MRC stated that Nielsen chose Boston as the first LPM market because Boston was smaller and had a more homogenous population than other major television markets, and thus the LPMs were less likely to produce skewed data in that market. Even in Boston, however, the

21

LPMs did not generate accurate data, as the MRC Executive Director further testified: "[I]t became clear that Nielsen's assumptions about easily measuring the [Boston] market proved inaccurate."[11]

67.    Initially, most local television broadcast stations in Boston did not utilize Nielsen's LPM services due to the well recognized flaws in the system.  However, Nielsen removed the Meter-Diary System from the Boston market, thereby eliminating the only other alternative. Ultimately, the stations needed ratings data in order to sell advertising time, and in the absence of a viable alternative from Nielsen or another supplier (because there are no other suppliers), they were effectively forced to buy the LPM service.  Following the implementation of the LPM system in Boston, the ratings of local broadcast stations significantly decreased, and the ratings of cable systems increased.

68.    After auditing the Boston LPM system, the MRC recommended that, in the future, Nielsen should implement LPM services only *after* receiving MRC accreditation.  Despite the MRC's recommendation, Nielsen did not receive advance accreditation for any of the twenty LPM systems it subsequently launched, including in the Miami-Fort Lauderdale market. Moreover, only ten of Nielsen's twenty-one LPM systems currently are accredited by the MRC.

69.    Nielsen was and is well aware that the LPM system does not accurately measure the viewing habits of certain demographic groups unless the necessary adjustments are made for the particular market.  As a recent Nielsen communication to its clients acknowledges, "certain demographic groups in [various LPM local market] panels fault more than others.  These include

---

[11] *Hearing on Television Ratings Accuracy and the FAIR Ratings Bill Before the Senate Committee on Commerce, Science and Transportation*, 109th Congress (July 27, 2005) (written testimony of George Ivie, Executive Director and CEO of the Media Ratings Council).

22

large households (household size 5+), younger households (Age of Head <35), Black households and Hispanic households."[12]

### D. Undeterred by flawed results, extensive public criticism and customer complaints, Nielsen continued to roll out unaccredited, flawed LPM systems in major urban markets across the country.

70.    In mid-2004, Nielsen was subjected to extensive public criticism as it planned to launch unaccredited LPM systems in New York and Los Angeles.

71.    In 2004, the public interest group "Don't Count Us Out" mounted an extensive campaign against Nielsen, focusing on the LPMs' inaccurate measurement of the television viewing habits of minorities.

72.    Public officials, including Congressman Charles Rangel of New York, became involved in the controversy.  Two days before Nielsen was scheduled to launch its LPM system in New York, Congressman Rangel announced that Nielsen had agreed to a two-month delay. Additionally, Congressman Rangel announced that Nielsen Chief Executive Officer Susan Whiting had agreed to form the Task Force on TV Measurement (the "Task Force"), which was charged with studying means of assuring that African American and Latino viewers were counted accurately.  The Task Force was an independent body of public officials and prominent community, business and media industry leaders from around the United States.  The Task Force's mandate was to examine the accuracy of minority audience measurement by Nielsen, report its findings and make recommendations for improvements to Nielsen.

73.    Before the Task Force could formulate conclusions and make recommendations, Nielsen launched the New York LPM system in June 2004 without MRC accreditation.  Only

---

[12] Client Communication, The Nielsen Company, *Nielsen to Launch PC Plus and On Track in Cleveland, Houston, Miami and Seattle* (Nov. 10, 2008).

after reviewing Nielsen's plan to address race classification issues and observing improvement in fault rate levels did the MRC Television Committee vote to grant Conditional Accreditation to the New York LPM system.

74.     Similarly, Nielsen launched the Los Angeles LPM system in 2004 without MRC accreditation. The MRC granted Conditional Accreditation to the Los Angeles LPM system only after Nielsen submitted an action plan to remedy the system's non-compliance with the MRC's Minimum Standards for Media Rating Research and agreed to submit to an on-going monitoring process to ensure that Nielsen completed improvement initiatives.

75.     The Task Force issued a Report in March 2005, stating in part: "The Task Force finds that LPM technology has the potential to more accurately measure the diverse viewing audience than diaries. However, the demographic complexity of the nation's urbanized TV markets where LPMs have been implemented makes it more difficult to measure viewers than at the national level. Thus, modification of Nielsen's sampling techniques to address this problem in cities where it introduces Local People Meters would more clearly reflect the ethnic intra-diversity of these markets."[13] The Task Force also found that "since certain ethnic households tend to fault at higher rates than the overall sample population, serious questions are raised about the accuracy of TV ratings among minorities."[14]

---

[13] Report of the Task Force on Television Measurement, at 3 (March 2005).

[14] *Id.* at 4.

24

~~75.~~

### E.   Nielsen has vigorously opposed regulatory oversight of and legislative remedies for the LPM problem, but has refused to fix the problem itself.

76.    Public criticism of the LPM systems and the inaccurate data that results from disproportionate faulting among certain demographic groups, including African Americans and Latinos, led the Senate Commerce Committee to hold hearings in July 2004 and July 2005 concerning Nielsen's implementation of the LPM systems.   Testifying about Nielsen's New York LPM system at the July 2005 hearing, the Executive Director of the MRC stated that "[t]here were many problems identified in the audit, including race and origin classification errors, excessive and excessively disproportionate faulting and metering issues."[15]

77.    Testifying at the July 2004 hearing regarding the launch of Nielsen's LPM system in Los Angeles, Thomas Arnost, co-President of the Univision Television Group, stated that Nielsen's Los Angeles LPM "[c]learly . . . failed to meet or come close to properly representing the Hispanic population as evidenced by [Nielsen's] own contradictory reports of Hispanic viewing habits in L.A." [16]   Nielsen's pre-launch LPM data in Los Angeles produced results that were "statistically impossible to occur."[17]   Mr. Arnost further stated:   "We understand that in today's highly fragmented TV world, Nielsen's job is more difficult than ever.   But that still is

---

[15] *Hearing on Television Ratings Accuracy and the FAIR Ratings Bill Before the Senate Committee on Commerce, Science and Transportation*, 109th Congress (July 27, 2005) (written testimony of George Ivie, Executive Director and CEO of the Media Ratings Council).

[16] *Hearing on the Implementation of Nielsen's Local People Meter TV Rating System Before the Senate Committee on Commerce, Science and Transportation*, 108th Congress (July 15, 2004) (written testimony of Thomas Arnost, Co-President of Univision Television Group).

[17] *Id.*

25

not an excuse to settle and say 'well that's close enough' – not as long as Nielsen remains the only single source of measurement for what drives programming."[18]

78.     After the hearing, Senator Conrad Burns, Chairman of the Commerce Committee, wrote a letter to the Federal Trade Commission (the "FTC") stating concerns about Nielsen's monopoly status, its business practices, its conditional MRC accreditation, and its intention to roll out LPM systems in many more markets despite its awareness of the problems in New York. Senator Burns wrote:

> It is this pattern of behavior that has alarmed me, many other members of Congress, and a significant number of experienced media and advertising industry players: the rapid rollout of a system with well-known flaws to new markets before the problems are fixed where they exist.  This pattern . . . suggests a tendency to place Nielsen's private interest above the public interest, which is the accuracy of TV ratings for all viewers, regardless of race, and a disregard for the critical role of the MRC in certifying new measurement technologies.[19]

79.     In July 2005, Senator Conrad Burns introduced the "Fairness, Accuracy, Inclusivity, and Responsiveness in Ratings Act of 2005" in the United States Senate.  The proposed legislation would have made MRC accreditation mandatory for future ratings services. At a Senate Commerce Committee hearing on his proposed legislation, Senator Burns stated: "Nielsen needs some kind of effective oversight because it is the only game in town. . . . Companies who need tv ratings data do not have anywhere else to go today even if there are

---

[18] *Id.*

[19] Letter from Senator Conrad A. Burns to Deborah Majoras, Chairman, Federal Trade Commission (April 6, 2005) (available at www.rbr.com/epaper/pdfs/BurnsMajorasLetter.pdf).

26

serious concerns about the numbers they are seeing as a result of Nielsen's samples."[20]   Nielsen vigorously opposed the legislation, and it was not enacted.

80.    Nielsen has launched LPM systems in twenty-one of the country's largest television markets.  Not one of these systems was accredited by the MRC when it was launched. According to the MRC website, only ten of Nielsen's twenty-one LPM systems have received MRC accreditation post-launch and, given that it is no longer under intense Congressional scrutiny, it is unclear whether Nielsen is actively seeking MRC accreditation in the eleven remaining LPM markets.

81.    For several years, Nielsen has opposed Congressional oversight by (1) arguing that the free-market system was working; (2) promising greater cooperation with the MRC; and (3) promising that it would improve the accuracy of LPMs and remedy the LPMs' undercounting of minority viewers.  However, the circumstances surrounding the launch of the LPM in the Miami-Fort Lauderdale indicate that (1) there is no free market for television ratings services because Nielsen remains the only game in town; (2) Nielsen continues to ignore the MRC's recommendation that it obtain accreditation before new LPM rollouts; and (3) in the absence of competition Nielsen has insufficient incentive to ensure the accuracy of its ratings.

***Nielsen's Anticompetitive Conduct Has Caused Sunbeam Serious Antitrust Injury Amounting to Many Millions of Dollars.***

> **A. Nielsen's launch of the flawed LPM system as the only ratings option in the Miami-Fort Lauderdale market has caused and will continue to cause Sunbeam millions of dollars of antitrust injury.**

---

[20] *Hearing on Television Ratings Accuracy and the FAIR Ratings Bill Before the Senate Committee on Commerce, Science and Transportation*, 109th Congress (July 27, 2005) (statement of Chairman Conrad Burns).

27

82.   The Miami-Fort Lauderdale television market is extremely diverse, comprised of myriad racial, ethnic and socioeconomic groups.   According to the United States Census Bureau, approximately 61% of Miami-Dade County's population is of Hispanic or Latino origin, and 20% of the population is African American.   The Census Bureau reports that a language other than English is spoken in approximately 68% of households in Miami-Dade County. Further complicating the demographics is the fact that the market's Hispanic population is comprised of a large number of distinct subgroups.   Nielsen acknowledges that this market is the most diverse and complex major local television market in the country, a fact that virtually guaranteed that the LPM data would be seriously flawed if Nielsen did not take necessary steps to ensure that its data collection and analysis were accurate.

83.   In October 2006, Nielsen announced that it would switch to an LPM system in the Miami-Fort Lauderdale market in October 2008.

84.   Nielsen's largest broadcast television customers in the Miami-Fort Lauderdale market informed Nielsen that the pre-launch LPM data that Nielsen released was inaccurate, and requested that Nielsen refrain from launching the LPM system, at least until these problems were addressed.   Nielsen ignored the pleas of its customers, and proceeded with the October 2008 launch of its flawed LPM system.

85.   Sunbeam was constrained to purchase the flawed LPM ratings from Nielsen, as Nielsen knew it would be. The data produced by the new LPM system contains significant defects, dramatically undercounting viewership of numerous demographic groups, including minority viewership.   The defective LPM data Nielsen has produced in the Miami-Fort Lauderdale market has caused WSVN's ratings to plummet.   For example, WSVN's reported

28

household ratings during the Primetime-Weekday daypart decreased by 45%, and its reported ratings during the Early Morning daypart declined 31%. Given that Nielsen has used <u>passive</u> meters to collect household ratings in the Miami-Fort Lauderdale market for several decades, the dramatic decline in household ratings indicates significant problems with the LPM system.

86.     These inaccurate and defective ratings have reduced Sunbeam's net advertising revenue for WSVN by more than $10 million annually, and have reduced its value as an ongoing business by more than $100 million.

87.     Notwithstanding the inaccurate ratings produced by the LPM system, Nielsen imposed a 20% price increase on Sunbeam when it implemented the LPM system in the Miami-Fort Lauderdale market.

88.     Furthermore, Nielsen has attempted to camouflage other substantial rate increases by ceasing to provide an array of reports that were formerly provided as part of the standard service agreement. Nielsen now charges for these reports individually – and over and above its standard service fees.

89.     As a direct result of Nielsen's exclusionary and oppressive practices, potentially innovative and more accurate product alternatives, including but not limited to PPMs, are not available to Sunbeam.

90.     As a direct result of Nielsen's exclusionary and oppressive practices, Sunbeam is forced to pay artificially inflated prices for Nielsen's products and services.

91.     If Nielsen had not stifled competition, television stations such as Sunbeam would have competitive alternatives to Nielsen from which to select, and Nielsen would be incentivized by such competition to provide better quality, more accurate products and services.

29

**B.  *Nielsen's oppressive and one-sided contract terms purport to preclude Sunbeam from any effective remedy.***

92.   Despite the ongoing unlawful conduct set forth in this complaint and despite the many millions of dollars in damages that Sunbeam has and will suffer as a result of Nielsen's injection of erroneous data into the Miami-Fort Lauderdale television market, the terms of the Sunbeam/Nielsen contract purport to leave Sunbeam with no recourse against Nielsen.

93.   In October 2007, a year in advance of Nielsen's planned launch of the LPM system in the Miami-Fort Lauderdale market, Nielsen required Sunbeam to enter into a fifty-seven month contract mandating, among other things, that Sunbeam pay increased rates for LPM data beginning in October 2008.  *See* Exhibit A.  That contract required Sunbeam to accept LPM ratings data sight unseen, even though: (a) Nielsen had encountered serious problems with the implementation of its LPM systems in other major markets with significant minority viewership; (b) Nielsen knew that such problems would likely be exacerbated in the Miami-Fort Lauderdale market due to its even larger and more diverse ethnic population; and (3) Nielsen did not plan to gain accreditation of its LPM system in the Miami-Fort Lauderdale market prior to launching it in October 2008.  *See id.*  Only after Nielsen secured long-term contracts to purchase LPM ratings from Sunbeam and other local television stations did Nielsen release LPM test data that revealed serious flaws in the planned LPM system.

94.   The contract also provides that, without notice to its customers, Nielsen can unilaterally make material changes to all aspects of its services, including but not limited to measurement techniques, service specifications and the format of its reports, if it deems such changes to be improvements.  *See* Exhibit A.  Sunbeam has no power to terminate the contract in the event that it finds any of the modifications objectionable.

30

95.     Nielsen's standard service contract previously provided that "Nielsen will use all reasonable efforts to provide [its clients] with data of the highest quality practicable."   In response to disputes between Nielsen and its customers regarding the quality and accuracy of its methodology and ratings data, Nielsen deleted this language from its standard service contracts.

96.     The terms of the Sunbeam/Nielsen contract do not provide Sunbeam with any right to terminate the contract, whereas Nielsen retains the right to terminate under various circumstances.  *See* Exhibit A.  By requiring that the contract include broad disclaimers, waivers and limitations of liability regarding Nielsen's services, all which benefit Nielsen, Nielsen has invoked blanket protection when it produces flawed ratings.  Further, receiving a refund or credit is purportedly Sunbeam's sole and exclusive remedy if Nielsen produces flawed data; however, an admission from Nielsen that an error has occurred is a prerequisite to Sunbeam's entitlement to either.  Such one-sided contract terms purport to absolve Nielsen of any responsibility or accountability to its clients and to insulate itself from any liability, leaving customers such as Sunbeam with no recourse.

## COUNT I — Violation of Section 2 of Sherman Act, Monopolization

97.     Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1 through 96.

98.     Nielsen has monopoly power in the relevant markets.

99.     As a result of the intentional exclusionary conduct described herein, Nielsen has maintained its monopoly in the Relevant Markets artificially, and thus prevented open and fair competition from actual or potential competitors.

31

100.  Nielsen's conduct has had and/or is likely to have the following effects, among others:

  a. actual and potential competition in the Relevant Markets has been injured, limited, reduced, restrained, suppressed and effectively foreclosed;

  b. consumers in the Relevant Markets, including but not limited to Sunbeam, have paid or are likely to pay anticompetitive prices, and have received or are likely to receive lower quality products and services and have been injured in their business and property;

  c. actual or potential customers in the Relevant Markets have been forced to accept defective   products and services; and actual and potential competitors of Nielsen have been effectively foreclosed from competing on the merits with Nielsen in the Relevant Markets.

  d. actual and potential competitors of Nielsen have been effectively foreclosed from competing on the merits with Nielsen in the Relevant Markets.

101.  Nielsen's actions achieve no legitimate competitive benefit to counterbalance the anticompetitive effects of Nielsen's exclusionary conduct.

102.  As a proximate and consequent cause of Nielsen's violation of Section 2 of the Sherman Act, Sunbeam has been injured in its business and property in that (a) Sunbeam has lost advertising sales and profits; (b) Sunbeam has paid supracompetitive prices to Nielsen; and (c) Sunbeam has suffered other injuries to its business.  Sunbeam has suffered antitrust injury by Nielson's provision of defective data in a program designed to maintain Nielsen's monopoly position.

103.  In addition to the injuries set forth above, Nielsen's conduct has caused additional injury to competition, consumers, and Sunbeam that cannot be compensated solely by monetary damages.  Accordingly, injunctive relief also is necessary to prevent irreparable harm caused by Nielsen's exclusionary and unlawful conduct.

32

### COUNT II — Violation of Section 542.19 of the Florida Antitrust Act

104.  Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1 through 103.

105.  Nielsen's conduct alleged above violates section 542.19 of the Florida Antitrust Act.

106.  As a proximate and consequent cause of Nielsen's violation of section 542.19 of the Florida Antitrust Act, Sunbeam has been injured in its business and property in that (a) Sunbeam has lost advertising sales and profits; (b) Sunbeam has paid supracompetitive prices to Nielsen; and (c) Sunbeam has suffered other injuries to its business.  Sunbeam has suffered antitrust injury by Nielson's provision of defective data in a program designed to maintain Nielsen's monopoly position.

107.  In addition to the injuries set forth above, Nielsen's conduct has caused additional injury to competition, consumers, and Sunbeam that cannot be compensated solely by monetary damages.  Accordingly, injunctive relief also is necessary to prevent irreparable harm caused by Nielsen's exclusionary and unlawful conduct.

### Count III — Violation of Section 501.204 of FDUTPA

108.  Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1 through 107.

109.  In the operation of its business, Nielsen has engaged in unfair methods of competition, unconscionable acts and practices, and unfair and deceptive acts and practices that include:

33

a. exclusionary and oppressive contracting practices that intentionally foreclose actual and potential competitors of Nielsen from introducing competing products into the Miami-Fort Lauderdale television market;

b. commercializing an unaccredited LPM system in the Miami-Fort Lauderdale market without addressing flaws in the LPM system and without taking commercially reasonable steps to ensure the reliability of the LPM data;

c. using its monopoly power in the television ratings industry to discontinue an accredited ratings service in the Miami-Fort Lauderdale market and then forcing broadcasters and other participants in the television industry, including Sunbeam, to use ratings data derived from an unaccredited LPM system that possesses significant methodological flaws; and

d. knowingly selling, as the only currency in the very diverse Miami-Fort Lauderdale market, ratings generated using a methodology that inaccurately measures the television viewing behavior of several demographic groups, including minority populations.

110.   As a proximate and consequent cause of Nielsen's violation of section 501.204 of the Florida Deceptive and Unfair Trade Practices Act, Sunbeam has been injured in its business and property in that (a) Sunbeam has lost advertising sales and profits; (b) Sunbeam has paid supracompetitive prices to Nielsen; and (c) Sunbeam has suffered other injuries to its business.

111.   In addition to the injuries set forth above, Nielsen's conduct has caused additional injury to Sunbeam and consumers generally that cannot be compensated solely by monetary damages.  Accordingly, injunctive relief also is necessary to prevent irreparable harm caused by Nielsen's exclusionary and unlawful conduct.

34

## Count IV – Breach of Contract

112.   Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1 through 111.

113.   Television audience measurement services and data reports are essential to Sunbeam's ability to conduct its business.  By reason of Nielsen's unlawful maintenance and perpetuation of its monopoly in the Relevant Markets, Sunbeam is unable to purchase television audience measurement services and data reports from any source other than Nielsen.  Nielsen's audience measurement services are essential to companies such as Sunbeam, which cannot effectively price or sell advertising time without them.  In order to conduct its business, Sunbeam is dependant upon Nielsen to produce reasonably reliable television ratings data.  Nielsen was aware that its ratings data would be used by Sunbeam to sell advertising time on WSVN; that its ratings data is the basis on which advertisers determine the amount they will pay for advertising time on WSVN; and that data which is inaccurate and undercounts WSVN's viewers would result in decreased revenue to Sunbeam.

114.   Accordingly, Nielsen and Sunbeam entered into a contract, effective as of November 2, 2007, pursuant to which Nielsen agreed to provide television audience measurement services and data reports to Sunbeam relating to WSVN's television audience, in exchange for which Sunbeam would pay a sum starting at $65,711 per month, escalating to $87,847 per month during the fifty-seven month term of the contract.  Sunbeam fully performed its obligations under the contract.  *See* Exhibit A.

115.   The essential purpose of the contract between Nielsen and Sunbeam is for Sunbeam to pay for and receive, and for Nielsen to produce, ratings data that reflect reasonably

35

reliable estimates of the number of viewers watching WSVN programming. Consistent with that purpose and in the absence of any contractual terms to the contrary, Sunbeam reasonably expected that Nielsen would exercise due care in the implementation of its LPM system in the Miami-Fort Lauderdale market and would implement adequate safeguards to ensure that its LPM system produced reasonably reliable television ratings data before such data was furnished to Sunbeam and disseminated throughout the market.

116. Under the terms of the contract, Nielsen is vested with broad discretion over the techniques and methods by which it compiles its television audience measurement data. For example and by way of illustration only, section D(5)(b) of the contract excuses Nielsen from its obligation to provide ratings data "when, in Nielsen TV's opinion, conditions are such as not to permit [Nielsen Station Index] techniques to produce such data in accordance with Nielsen TV standards." Similarly, section D(12) of the contract vests Nielsen with the discretion to make changes to any aspect of its ratings system unilaterally if, in Nielsen's judgment, the change "will tend to create a net improvement" in Nielsen's ratings service. Sunbeam has no right to be notified of such changes, much less to object to them. Appendix C to the contract is the Nielsen Local Reference Supplement, which outlines the methodology, techniques, policies and procedures utilized in the production of Nielsen's television ratings data. It expressly states that Nielsen "reserves the right in its sole discretion" to amend the supplement. *See* Exhibit A.

117. Nielsen is required to exercise the discretion reserved to it under the contract reasonably and with proper motive, not recklessly, arbitrarily, capriciously, or in a manner inconsistent with Sunbeam's reasonable expectations.

36

118.   Nielsen breached the terms of its contract with Sunbeam, its obligations of good faith and fair dealing, and its obligation to perform the services under the contract with due care by:

   a.   failing to provide reasonably reliable data that fairly estimates WSVN's viewers;

   b.   failing to take steps and implement appropriate safeguards to assure that the methodology of its television audience measurement system in the Miami-Fort Lauderdale market produces reasonably reliable data;

   c.   implementing an LPM system in the complex and racially diverse Miami-Fort Lauderdale market in light of known difficulties with Nielsen's prior implementation of LPM systems in other urban areas with like demographics without taking reasonable steps to assure that the data produced would be reasonably reliable;

   d.   implementing and commercializing an LPM system in the Miami-Fort Lauderdale market after failing and refusing to make corrections as were reasonably necessary to make the system capable of producing reasonably reliable data;

   e.   failing to take those steps, consistent with the exercise of due care and good industry practices, to assure that its LPM system as implemented in the Miami-Fort Lauderdale market was capable of producing reasonably reliable data;

   f.   performing under the contract recklessly, arbitrarily, capriciously and without proper motive in a manner inconsistent with Sunbeam's reasonable expectations; and

   g.   other diverse failures in its performance under the contract.

119.   As a result of Nielsen's material breach of the contract, Sunbeam has been injured in its business and property in that (a) Sunbeam has lost advertising sales and profits and (b) Sunbeam has suffered and will continue to suffer other injuries to its business.

120.   As the sole source of television audience measurement services by reason of its anti-competitive and exclusionary practices, as described above, and in furtherance of those

37

practices, Nielsen has been able to dictate the terms of its contracts with Sunbeam and its other

customers and to include within such contracts various oppressive disclaimers, waivers and

limitation of liability provisions, all of which represent a part of the economic benefit that

Nielsen enjoys by reason of its anti-competitive and exclusionary practices.  Such disclaimers,

waivers and limitation of liability provisions included within the contract, including any term of

the contract that renders the contract illusory, are invalid, unenforceable and against public

policy for the following reasons, among others:

    a.  The enforcement of such provisions is against public policy because Nielsen has been able to secure such provisions by reason of its monopoly power and the disparity of bargaining power resulting therefrom between Nielsen and Sunbeam, such that the contract did not represent a free choice on the part of Sunbeam because there was no substitute for Nielsen's services and Sunbeam could not have done business without purchasing Nielsen's services;

    b.  To enforce any such provisions would reward Nielsen for its illegal, anti-competitive and exclusionary practices;

    c.  Such provisions are so drastic as to remove any sufficient incentive for Nielsen to perform in good faith and with due care or to exercise its discretion in a reasonable manner;

    d.  Such provisions are unconscionable because, among other reasons, they render Nielsen's obligations under the contract illusory;

    e.  Nielsen is not permitted to exempt itself from intentional and grossly reckless conduct that undermines the central purpose of the contract; and

    f.  Nielsen cannot enforce the contract and exercise its discretion under the contract in such a way that it receives substantial benefits that flow directly from its illegal, anti-competitive and exclusionary conduct, as alleged above.

38

### Count V – Breach of Section D(5)(c) of the Sunbeam/Nielsen Contract

121.   Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1 through 120.

122.   Pursuant to section D(5)(c) of the contract, Nielsen agreed that if any errors, inaccuracies or omissions in its ratings data occurred, its policy would be to furnish appropriate correction notices, if feasible.  *See* Exhibit A.

123.   As set forth above, Sunbeam is dependent upon Nielsen to produce reasonably reliable television ratings data in order to conduct its business.  Nielsen was and is aware that when erroneous ratings data is produced and disseminated to Sunbeam and others in the Miami-Fort Lauderdale market that underestimates WSVN's viewership, the failure to correct such erroneous and inaccurate data will have a devastating impact on Sunbeam's ability to sell advertising time on WSVN.  Sunbeam and other market participants in the Miami-Fort Lauderdale market have made Nielsen well aware that its LPM data, which produces absurd results and is irreconcilable with the data that Nielsen has provided to Sunbeam for years, is erroneous and inaccurate.

124.   As a result of Nielsen's implementation of an LPM system as the sole audience measurement system in the Miami-Fort Lauderdale market before taking reasonable steps to correct flaws in the LPM system, along with other reasons set forth above, Nielsen has produced and continues to produce and disseminate ratings data to Sunbeam and others that is erroneous, inaccurate and contains omissions.

125.   Nielsen has materially breached section D(5)(c) of the contract by refusing to acknowledge obvious errors and inaccuracies in its television ratings data and refusing to furnish

appropriate correction notices, even though Nielsen is aware of errors and inaccuracies and the furnishing of correction notices is feasible.

126.   Additionally, Nielsen is vested with the discretion to determine that errors, inaccuracies or omissions in its ratings data occurred, and to furnish appropriate correction notices.   Nielsen is required to exercise the discretion reserved to it under the contract reasonably and with proper motive, not recklessly, arbitrarily, capriciously, or in a manner inconsistent with Sunbeam's reasonable expectations.

127.   Accordingly, Nielsen breached section D(5)(c)of the contract with Sunbeam, its obligations of good faith and fair dealing, and its obligation to perform the services under the contract with due care by failing to acknowledge obvious errors and inaccuracies in its television ratings data and refusing to furnish appropriate correction notices, even though Nielsen is aware of errors and inaccuracies and the furnishing of correction notices is feasible.

128.   As a result of Nielsen's material breach of the contract, Sunbeam has been injured in its business and property in that (a) Sunbeam has lost advertising sales and profits and (b) Sunbeam has suffered and will continue to suffer other injuries to its business.

129.   As the sole source of television audience measurement services by reason of its anti-competitive and exclusionary practices, as described above, and in furtherance of those practices, Nielsen has been able to dictate the terms of its contracts with Sunbeam and its other customers and to include within such contracts various oppressive disclaimers, waivers and limitation of liability provisions, all of which represent a part of the economic benefit that Nielsen enjoys by reason of its anti-competitive and exclusionary practices.   Such disclaimers, waivers and limitation of liability provisions included within the contract, including any term of

40

the contract that renders the contract illusory, are invalid, unenforceable and against public

policy for the following reasons, among others:

    a.   The enforcement of such provisions is against public policy because Nielsen has been able to secure such provisions by reason of its monopoly power and the disparity of bargaining power resulting therefrom between Nielsen and Sunbeam, such that the contract did not represent a free choice on the part of Sunbeam because there was no substitute for Nielsen's services and Sunbeam could not have done business without purchasing Nielsen's services;

    b.   To enforce any such provisions would reward Nielsen for its illegal, anti-competitive and exclusionary practices;

    c.   Such provisions are so drastic as to remove any sufficient incentive for Nielsen to perform in good faith and with due care or to exercise its discretion in a reasonable manner;

    d.   Such provisions are unconscionable because, among other reasons, they render Nielsen's obligations under the contract illusory;

    e.   Nielsen is not permitted to exempt itself from intentional and grossly reckless conduct that undermines the central purpose of the contract; and

    f.   Nielsen cannot enforce the contract and exercise its discretion under the contract in such a way that it receives substantial benefits that flow directly from its illegal, anti-competitive and exclusionary conduct, as alleged above.

### PRAYER FOR RELIEF

Wherefore, Plaintiff prays for the following relief:

(a)    that the Court grant Plaintiff judgment in its favor on all counts;

(b)    that the Court award treble the damages sustained by Plaintiff on Counts I and II, in the amount to be proved at trial;

(c)    that the Court award damages sustained by Plaintiff on Count III in the amount to be proved at trial and attorneys' fees and costs as provided by statute;

(d)    that the Court award damages sustained by Plaintiff on Counts IV and V in the amount to be proved at trial;

(e)    that the Court award Plaintiff appropriate injunctive or other equitable relief to prevent Nielsen from continuing to unlawfully monopolize the Relevant Markets,

including without limitation an order requiring the termination of multi-year, staggered contracts in effect with television stations to allow full and fair competition for the business of those customers, and the immediate termination of the LPM system in the Miami-Fort Lauderdale television market;

(f)     that the Court award Plaintiff appropriate injunctive or other equitable relief to prevent Nielsen from continuing to engage in oppressive contracting practices;

(g)     that the Court find that Nielsen breached its contract with Sunbeam and violated its covenant of good faith and fair dealing;

(h)     that the Court award Plaintiff interest, including prejudgment interest, attorneys' fees and costs of suit; and

(i)     that this Court grant Plaintiff such other and further relief as the Court deems just and proper.

### JURY DEMAND

Plaintiff hereby demands a trial by jury of all issues so triable.

Respectfully Submitted,

EDWARDS ANGELL PALMER & DODGE LLP
One North Clematis Street, Suite 400
West Palm Beach, Florida 33401
Telephone:     (561) 833-7700
Facsimile:     (561) 655-8719

By:     _Elaine Johnson James_

Elaine Johnson James, Fla. Bar No. 791709
*Attorney for Plaintiff, Sunbeam Television Corp.*

Of Counsel:     Michael T. Gass (Mass. Bar No. 546874 )
Robert M. Buchanan, Jr. (Mass. Bar No. 545910)
CHOATE HALL & STEWART LLP
Two International Place
Boston, MA 02110
Telephone:     (617) 248-5000
Facsimile:     (617) 248-4000

42

Christine M. O'Connor (Mass. Bar No. 647535)
EDWARDS ANGELL PALMER & DODGE LLP
111 Huntington Avenue
Boston, MA 02199
Telephone:     (617) 239-0100
Facsimile:     (617) 227-4420

43

# EXHIBIT A

MMST wod 102006

# NIELSEN STATION INDEX SERVICE AGREEMENT
## COMMERCIAL TELEVISION STATIONS IN METERED AND LOCAL PEOPLE METER MARKETS

for

## Sunbeam Television Corp.

1

MMST wod 102006



**Nielsen
Media Research**

# Nielsen Station Index Service Agreement
## Commercial Television Stations in Metered and Local People Meter Markets

Nielsen Media Research, Inc.
150 North Martingale Road
Schaumburg, IL  60173-2076

Date of Proposal: __10/4/07__

**Sunbeam Television Corp.** ("Client"), a(n) _____ [State]

☐ Corporation   ☐ Partnership   ☐ Limited Liability Company/Partnership
☐ Individual d/b/a   ☐ Other _____

with its principal offices at **1401 79th Street Causeway, Miami, FL 33141**, on behalf of television station **see Appendix A** located in or near the city of **see Appendix A** (and such station's primary digital programming outlet that fully replicates and will replace the analog station) and satellite station(s) subject to Section C.2, hereby request(s) a license for Nielsen Station Index Metered Market Service ("NSI Metered Market Service") and/or Nielsen Station Index Local People Meter Market Service ("NSI Local People Meter Market Service") for the following NSI Market **see Appendix A** ("Client's Market") and Nielsen Media Research, Inc. ("NielsenTV"), hereby agrees to furnish such service ("Agreement") on the following terms and conditions:

## A: SCOPE OF SERVICE

1. **Areas Measured** shall be substantially as defined in Appendix C, Local Reference Supplement.

2. **Sampling Methods** shall be substantially as described in Appendix C.

3. **Measurement Methods** shall be substantially as described in Appendix C.

4. **Sample Sizes.** See Section I. of Appendix A.  For further details, statistical interpretations, etc., see Appendix C.

5. **Regular Data Analyses Per Year** shall be: (a) **see Appendix A** Monthly Analyses, averaging approximately four (4) weeks of measurement per Analysis; and (b) not less than three hundred sixty five (365) Daily DMA Ratings Summaries.

6. **Types of Analyses** shall be as follows:

   (a) Regular Data Analyses

      1. NSI Monthly Data Analyses, per attached Appendix B-1, first Analysis covers survey period **see Appendix A**

      2. NSI Daily DMA Ratings, per attached Appendix B-2.

   (b) **Special Data Analyses** which are, generally, retabulations or special cross-analyses of NSI information in forms other than those shown in Regular Data Analyses are available, at extra charges specified on request; provided that NielsenTV shall be obligated to furnish only such Special Analyses as are deemed, by NielsenTV, to be reasonably accurate and not inconsistent with the divulgence policies of NielsenTV.

7. **Copies of Regular Data Analyses** shall be furnished to Client as follows:

   (a) **Master Copy.** One Master Copy of each Regular Data Analysis is supplied without added charge.

2

MMST wod 102006

**(b) Extra Copies.** Extra copies of Regular Data Analyses for the use by Client's directors, partners, broadcast consultants, officers and employees whose names and addresses shall be supplied to NielsenTV by Client, are to be paid for by Client as specified in Section C.1(c).

**8. Information in Each Regular Data Analyses** shall be substantially as shown in Appendices B-1 and B-2, and is subject to limitations and qualifications set forth therein and Appendix C. Stations reported and audience estimates reported shall be substantially in accordance with NielsenTV standards as stated in Appendix C.

**9. Delivery.** All Regular Data Analyses will be delivered as rapidly as practicable. NielsenTV reserves the right to discontinue any Data Analyses if the same or similar data is contained in electronic data transmissions furnished to Client.

## B. COMMENCEMENT, DURATION AND TERMINATION

**1. Commencement Date.** This Agreement, and Nielsen Station Index Metered Market Service and/or Nielsen Station Index Local People Meter Market Service hereunder, shall commence on **January 1, 2008** ("Commencement Date").

**2. Duration.** SUBJECT TO THE PROVISIONS OF SECTION B.4., THIS AGREEMENT, AND NIELSEN STATION INDEX METERED MARKET SERVICE AND/OR NIELSEN STATION INDEX LOCAL PEOPLE METER MARKET SERVICE HEREUNDER, SHALL HAVE A "MINIMUM DURATION" OF **Five (5)** YEARS AND SHALL EXPIRE AND TERMINATE ON SEPTEMBER 30, 2012 OR CONTINUE THEREAFTER UNTIL THIS AGREEMENT IS TERMINATED AS PROVIDED IN SECTIONS B.3. OR B.4.



~~**3. Termination by Client.** This Agreement, and Nielsen Station Index Metered Market Service and/or Nielsen Station Index Local People Meter Market Service hereunder, may be terminated by Client, for any reason, by serving notice in writing on NielsenTV at any time, which notice shall be effective on expiration of the eighth month next following the month during which notice shall have been served or upon such later date as specified by Client; provided, however, that such termination shall not in any case be effective prior to expiration of the period of Minimum Duration specified in Section B.2. In the event of such termination, the final eight (8) months of service shall be deemed the "Termination Period". This Section was~~ **intentionally deleted from this Agreement.**

**4. Termination by NielsenTV.** This Agreement, and Nielsen Station Index Metered Market Service and/or Nielsen Station Index Local People Meter Market Service hereunder, may be terminated by NielsenTV, for any reason, by serving notice on Client at any time and by refunding promptly all moneys paid for services not to be rendered, which notice shall not become effective prior to the expiration of the period of Minimum Duration specified in Section B.2., except, however, that termination may be effective on any date specified by NielsenTV upon such notice in the event of non-performance and/or breach by Client of any one or more of its obligations hereunder, or if NielsenTV shall be unable for any cause beyond its control to fulfill its obligations hereunder; or if NielsenTV shall terminate Nielsen Station Index Metered Market Service and/or Nielsen Station Index Local People Meter Market Service, covering Client's Market, to all stations then subscribing to Nielsen Station Index Metered Market Service and/or Nielsen Station Index Local People Meter Market Service for the said market.

**5. Termination of License.** Upon termination or expiration of this Agreement, the license granted to Client hereunder shall automatically terminate.

## C. PRICES AND TERMS

**1. Price of Service, etc.** Client agrees to pay NielsenTV for Nielsen Station Index Metered Market Service and/or Nielsen Station Index Local People Meter Market Service and the license to use NSI Analyses, as follows:

**(a) For Regular Data Analyses.** A total monthly charge ("Monthly Charge") obtained by applying to the base rate per month ("Monthly Base Rate"), determined (each month) in accordance with Section III. of Appendix A (after any alterations required to reflect conditions then existing) and any applicable discounts, adjustments and surcharges.

3

(b) For Special Data Analysis, if ordered by Client: Charges quoted in each case or, in the absence of a quotation, reasonable charges in relation to NielsenTV's costs.

MMST wod 102006

(c) Extra Copies of Regular Data Analyses ordered by Client will be furnished at NielsenTV's standard price as announced to clients from time to time.

(d) Electronic transmissions of Data Analyses, if applicable, may be subject to additional charges as determined by NielsenTV.

2. Termination of Service. An amount equal to ten percent (10%) of Client's Monthly Base Rate shall be added to Client's invoices during each of the eight months of the Termination Period. This Section was intentionally deleted from this Agreement.

3. Satellite Station Surcharges. In the event Client includes or adds one or more satellite station(s) under this Agreement, the corresponding surcharge specified in Appendix A will be added to Client's Monthly Base Rate for each such satellite station, effective on the first of the month in which NielsenTV commences providing such service.

4. Multiple Ownership or Operation. If Client (i) currently has or during the term of this Agreement enters into any joint management, sales or operating agreement or other similar business relationship with another station or channel in the Market(s) specified herein, (ii) has purchased or purchases another station or channel in the Market(s) specified herein, or (iii) is or was purchased or controlled by an entity owning or otherwise controlling other stations or channels in the Market(s) specified herein, Client shall give NielsenTV written notice of such change and the effective date thereof within thirty (30) days of the change. The additional station or channel shall be deemed to be covered by this Agreement subject to the rates specified herein and by appendix or amendment to the Agreement, or Client shall enter into a separate agreement for said station or channel, as of the first survey period that the additional station or channel has reached a weekly cumulative audience of at least two and one-half percent (2.5%), as determined or defined in Appendix C under the caption "Reportability Standards," and shall then remain covered by this Agreement or under separate agreement for the term thereof. In such case, Client agrees that NielsenTV has the right to re-determine the Monthly Base Rate specified herein, or establish a new Monthly Base Rate in a separate agreement, and apply any charges/surcharges as well as add any ancillary services to which Client subscribes in that Market(s), in accordance with NielsenTV's then current rates. Such Monthly Base Rate shall be effective as of the first day of the month of the survey period in which the additional station or channel reaches the 2.5% cumulative audience, whether at the time of or after the occurrence of any event described in (i) through (iii) above, and whether or not Client notifies NielsenTV thereof. This Section C.4 shall also apply in the event that the circumstances specified in subsections (i) through (iii) involve Client's parent company, other controlling entity, or any entity in any manner related to Client.

5. Digital Stations and Multicasting. Client's digital subchannels shall be covered by this Agreement, as determined by NielsenTV in its sole discretion which shall not be unreasonably withheld, subject to the rates specified herein and by appendix or amendment to the Agreement, as of the first survey period that the digital subchannel reaches a weekly cumulative audience of at least two and one-half percent (2.5%), as determined or defined in Appendix C under the caption "Reportability Standards," and shall then remain covered by this Agreement for the term hereof. Client shall give NielsenTV thirty (30) days' written notice of the commencement date of, or change to, the broadcasting of such digital subchannel. Client agrees that NielsenTV has the right to establish a Monthly Base Rate for such digital subchannel, as well as add any ancillary services to which Client subscribes in that Market, in accordance with NielsenTV's then current rates. Such rate(s) shall be effective as of the first day of the month of the survey period in which the digital subchannel reaches the 2.5% cumulative audience, whether at the time of or after the commencement date of, or change to, the broadcasting, and whether or not Client notifies NielsenTV thereof.

6. Substandard Sample Alternatives. In the event that the in-tab sample for a Regular Data Analysis is less than the minimum in-tab household standard as shown in the Regular Data Analysis, such Analysis will be revised to delete Metro Ratings or any data not in compliance with said NSI minimum in-tab household standard. Should such revision not be practicable, such Analysis will not be distributed and Client shall be credited with the entire net billing otherwise due for such Analysis or NielsenTV may offer to supply (on request from Client within fifteen (15) days after notice from NielsenTV that the Regular Data Analysis will not be distributed) a single copy of a Special Data Analysis (distinctively labeled) for management purposes only and in such event no credit will be provided to Client.

4

MMST wod 102006

**7. Surcharge for Taxes.** All net charges hereunder shall be increased to the extent of any sales, use or other tax on NSI Data Analyses or Service, which may be payable or required to be collected by NielsenTV.

**8. Billing and Payment:**

**(a) Regular Data Analyses.** Each Monthly Charge is billable on or after the first day of such month.

**(b) Special Analyses and Extra Copies of Regular Data Analyses** are billable on or after shipment.

**(c)** Client agrees to pay each invoice promptly on presentation but in no event later than thirty (30) days thereafter. All amounts not paid within thirty (30) days after presentation shall be considered in default and shall bear interest at the rate of eighteen percent (18%) per annum (or the highest rate allowed by applicable law, if lower) from the date due until paid, payable on demand.

**9. Default in Payment.** If Client shall remain in default with respect to the payment of any invoices rendered in accordance with the provisions of this Agreement (including any interest due as specified in Section C.8.(c)), then NielsenTV may, following notice to Client, suspend all services and licenses hereunder without thereby being in default of NielsenTV's obligations, or affecting Client's obligations, under this Agreement.

**10. Billing for Terminal Year.** If Nielsen Station Index Metered Market Service and/or Nielsen Station Index Local People Meter Market Service is terminated by either Client or NielsenTV, the number of charges for Monthly Data Analyses based on the Monthly Base Rate (subject to fulfillment of any Termination Period) with respect to the terminal year (which shall begin on the anniversary of the Commencement Date specified in Section B.1.) shall be:

$$\frac{(D \times 12)}{S}$$

where D = number of months in which Monthly Data Analyses or Daily DMA Ratings were delivered during the terminal year, and S = number of months in which Monthly Data Analyses or Daily DMA Ratings were ordered (pursuant to Section II. of Appendix A) with respect to said terminal year.

**11. Costs of Enforcement.** If NielsenTV retains a collection agent and/or counsel for the purpose of enforcing its rights under this Agreement, Client agrees to pay, on demand, NielsenTV's costs and fees (including court costs, collection agent and attorney's fees and costs of investigation) in connection therewith.

### D. GENERAL PROVISIONS

**1. Non-Exclusive Service.** Nielsen Station Index Metered Market Service and/or Nielsen Station Index Local People Meter Market Service is furnished and licensed on a non-exclusive basis, and NielsenTV is not restricted hereunder or otherwise from furnishing, to any other person, corporation or other entity, any type of information, data or service. The sample households for the Metered Market service may also be used in common with other NielsenTV services.

**2. Permissible Uses, Etc.** Client agrees to adhere strictly to the provisions set forth in the attached Appendix C under the caption, "Permissible Uses of Analysis Data", and not use or attempt to use all or any portion of the NSI data or any abstracts or summaries thereof in any legal proceeding (including, but not limited to, any use in litigation and/or use with any governmental investigatory, regulatory or other body or authority). Client shall have the right to furnish the data in the Analyses to any third-party consultants retained by Client for use solely by or on behalf of Client provided that Client shall cause such consultant to enter into NielsenTV's then standard form of Consultant Confidentiality Agreement prior thereto to protect the confidential and proprietary nature of such data.

**3. Client Responsibility.** Client assumes full responsibility to NielsenTV for any violation (whether occurring before or after termination hereof) by any director, partner, officer, employee, consultant, agent or representative of Client of any obligation assumed by Client hereunder and agrees to take all steps necessary to ensure understanding of and compliance with this undertaking by all persons having access to NSI materials licensed or furnished hereunder. Client acknowledges that a violation of any of the provisions contained or referred to in this Section or Sections D.2, D.8. or D.9. hereof will cause irreparable harm to NielsenTV's business, for which there is no adequate remedy at law. Accordingly, in the event of any such violation, Client agrees that NielsenTV shall be entitled, in addition to any other remedies it may have, at law

5

MMST Wod:102006

or in equity, to immediate and permanent injunctive relief against Client, its employees, agents and/or other third parties acting through, for or with any of the foregoing. Client is responsible for the confidentiality and security of the ID(s) and password(s) provided by NielsenTV for access to any and all NielsenTV information, data or service(s), and all charges therefrom, whether or not authorized by Client.

**4. Data Regarding Client's Station.** Client consents to NielsenTV's inclusion of, in NSI Analyses or other material furnished to Client and/or any other persons, data pertaining to Client's station as reported by NielsenTV.

**5. Accuracy, Errors, Non-Performance, Etc.**

(a) NIELSENTV DISCLAIMS AND CLIENT HEREBY WAIVES, ANY AND ALL WARRANTIES, WHETHER EXPRESS OR IMPLIED, TO CLIENT OR TO ANY THIRD PARTY, WITH RESPECT TO ANY REPORTS OR INFORMATION PROVIDED HEREUNDER INCLUDING, BUT NOT LIMITED TO, ANY WARRANTIES OF MERCHANTABILITY OR OF FITNESS THEREOF FOR ANY PARTICULAR PURPOSE. The foregoing disclaimer shall neither act as nor constitute an admission by NielsenTV that any of the foregoing constitute goods, commodities, or tangible personal property under or for the purposes of any applicable law.

(b) **Effect of Sub-Standard Conditions.** NielsenTV shall not be obligated to furnish any NSI data hereunder when, in NielsenTV's opinion, conditions are such as not to permit NSI techniques to produce such data in accordance with NielsenTV standards, nor shall Client be entitled to any right of termination or abatement of price hereunder by reason of failure by NielsenTV to publish NSI data for such reasons, except as provided in sub-section D.5.(c).

(c) **Limitation of Liability.** Except for the refund or credit specifically provided in this subsection 5.(c), NielsenTV shall not be liable, in contract or tort, for any loss, cost, expense, injury or damage of any kind, including, without limitation, any incidental or consequential damages (including, without limitation, lost profits and loss of or damage to goodwill), even if NielsenTV is advised or has knowledge of the possibility thereof, directly or indirectly resulting from (i) NielsenTV's failure, for any reason, to furnish any NSI Analyses as required by this Agreement; (ii) any errors, inaccuracies or omissions in any NSI Analyses; (iii) any action or inaction, whether or not negligent, of NielsenTV, or any person acting on NielsenTV's behalf, in compiling or publishing any NSI Analyses or in delivering or communicating the same to Client or others; or from the use or publication of the same by Client or others; or (iv) contingencies beyond NielsenTV's control. If any errors, inaccuracies or omissions occur, it will be NielsenTV's policy, if feasible, to furnish appropriate correction notices. If NielsenTV shall fail, for any reason, to furnish any NSI Analyses, NielsenTV shall provide Client with a refund or credit (as appropriate) of any amount paid for the subject NSI Analyses and NielsenTV's liability shall be limited to such refund or credit, Client agreeing that such remedy shall be Client's sole and exclusive remedy, at law or in equity, in the event of the occurrence of any event described in (i) through (iv) above. The amount paid for a Regular Data Analysis will be computed as the Monthly Net Charge times 3.33% for each Daily DMA Ratings Analysis, and one hundred percent (100%) for each Monthly Data Analysis. The refund or credit shall not be cumulative, i.e. only the larger of such two (2) amounts shall be refunded or credited.

**6. Program Names.** Client agrees to supply to NielsenTV, at the time requested by NielsenTV, a suitable program name for each quarter hour of telecasting for Client's station or satellites, if any, to be reported by NSI; such listings to indicate major changes, substitutions and/or revisions of normal scheduling that occur during the measured interval. In the event such records as supplied to NielsenTV may prove to have been inaccurate or inadequate so that in NielsenTV's judgment a correction notice for a published NSI Regular Data Analysis becomes necessary, Client agrees to pay for all reasonable reprocessing, printing and distribution charges incurred by NielsenTV in the issuing of a suitable correction notice.

**7. Encoding and Lineup Information.** Client agrees, at NielsenTV's request, to encode all broadcasting on Client station(s), and satellites if any, in accordance with NielsenTV's then-current coding technology and to comply with all encoding procedures as NielsenTV may determine during the term of this Agreement, including without limitation Client's responsibility for the acquisition, cost, installation, operation and maintenance of all required encoding equipment. In the absence of encoding, NielsenTV may produce ratings data for a limited time, but NielsenTV shall have no liability with respect to the production and/or accuracy thereof.

6

MMST wod 102006

**8. Identity of Sample Households.** Client agrees that it will not, under any circumstances, attempt to ascertain the name, location of, or other particulars with respect to, or contact, any household furnishing television information to NielsenTV, nor shall NielsenTV be under any obligation to provide Client with access to any such household or information relating thereto. Client also agrees that if it becomes aware of any information regarding any NielsenTV household, it will keep such information confidential and not divulge or use such information and it will promptly report to NielsenTV any such information that has come to its attention, including attempts by such households to voluntarily provide Client or others with information concerning any aspect of their participation in a NielsenTV television survey or offers by third parties of such information. Client also agrees that it will not permit any of its employees or any member of an employee's household to participate in any such survey or to help any participating family with any activity connected with NielsenTV television data collection.

**9. Title to NSI Material.** Client recognizes that all printed or written material or electronic data transmission supplied hereunder is furnished merely to convey the information therein contained and that such material remains the property of NielsenTV, licensed to Client for confidential use in accordance with the provisions of the Agreement; and Client agrees to return the master copy, all extra copies of NSI Analyses and all summaries and abstracts thereof to NielsenTV on demand at any time more than two (2) years after the date of delivery (except that upon termination of this Agreement return shall be made on demand) at Client's expense, except that if any such analysis has been destroyed prior to such demand, Client shall certify such destruction.

**10. Survival of Terms.** The provisions of paragraphs C.7., C.11., D.2., D.3., D.5., D.8., D.9., and D.11, hereof shall survive termination of this Agreement.

**11. Adjustments of Billings, Etc.** Upon discovery of any error in billing of or payment for Nielsen Station Index Metered Market Service and/or Nielsen Station Index Local People Meter Market Service hereunder, either party hereto may, within twelve (12) months following the making of said error, but not more than three months following delivery of the last NSI Regular Data Analysis due hereunder, serve notice on the other party, requesting adjustment; and any such claim found to be justified shall be settled promptly.

**12. Improvement, Revision of Agreement, Etc.** To facilitate improvements in Nielsen Station Index Metered Market Service and/or Nielsen Station Index Local People Meter Market Service, and to meet changing conditions and unforeseen circumstances, NielsenTV shall have the following rights:

(a) To make, without notice, any changes in the Regular Data Analysis areas measured, Analysis format, specifications, information and techniques which: (1) in its judgment will tend to create a net improvement in Nielsen Station Index Metered Market Service and/or Nielsen Station Index Local People Meter Market Service, or (2) may be requested or recommended by the Media Rating Council or required by government action, or any changes in the Reference Supplement, from time to time.

(b) To serve notice on Client setting forth such other changes of format, schedules, specifications, techniques or information, or of prices and/or other provisions of this Agreement excluding Sections C.2 through C.5, as NielsenTV shall deem necessary or desirable and stating the effective date thereof, which shall be not less than thirty (30) days after serving such notice. Such changes shall become effective on the stated date; provided, however, that in the case of price changes excluding Sections C.2 through C.5, Client may notify NielsenTV in writing, within thirty (30) days after service of NielsenTV's notice, of its refusal to accept such changes. Client's notice of refusal shall operate as notice of termination of this Agreement as of the effective date of the price changes and in the event of Client's refusal (as aforesaid), such price changes shall not be applicable to Client: provided, however, that NielsenTV, solely within its own discretion, may at that time elect to forego such changes in price and continue this Agreement.

**13. Modification/Waiver.** This Agreement shall not be modified except in writing. Only the Chief Executive Officer, President or Coordinating Vice President is authorized to execute any such modification for NielsenTV. No waiver by either party of any breach of the Agreement by the other shall be deemed to be a waiver of any preceding or subsequent breach thereof.

**14. Assignability.** This Agreement, including both its obligations and benefits, shall pass to and be binding on the respective transferees and successors of the parties, except that neither this Agreement nor any of

7

MMST wod 102006.

Client's rights or obligations shall be assigned, transferred or otherwise encumbered by Client without the prior written consent of NielsenTV, which consent will not be unreasonably withheld. Notwithstanding the foregoing, NielsenTV may accept payment or performance hereunder from any purported transferee or successor without waiving its right to enforce the provisions of this Agreement (including, without limitation, all of Client's payment obligations hereunder) against Client at any time. NielsenTV reserves the right to assign, transfer, set over or sell its rights and obligations hereunder to any successor to NielsenTV or its NSI business, including, without limitation, any corporation or other transferee controlling, controlled by or under common control with NielsenTV, and reserves the right to have all services rendered by such successor upon notice to Client.

**15. Notice.** Each notice required hereunder shall be in writing, and deposited thereof in the United States mail addressed by registered or certified mail, to Client at:

| | |
|---|---|
| Client Name: | **Sunbeam Television Corp.** |
| Attention/Title: | |
| Address: | **1401 79th Street Causeway** |
| City/State/Zip: | **Miami, FL 33141** |

or to NielsenTV at Nielsen Media Research, Inc., 150 North Martingale Road, Schaumburg, IL 60173-2076, Attention: Coordinating Vice President, with a copy to Nielsen Media Research, Inc., 770 Broadway, New York, NY 10003-9595, Attention: General Counsel; or to such other address as either party hereunder shall subsequently notify the other.

**16. Acceptance and Construction.** This Agreement shall be executed by Client within 60 days of the proposal date and, following execution by Client, is subject to acceptance by NielsenTV in Schaumburg, Illinois, and until so accepted shall not constitute a contract. The Agreement shall be construed under the laws of the State of Illinois applicable to agreements to be performed entirely therein, and to resolve any controversy or claim arising under or related to this Agreement. Only the Chief Executive Officer, President or Coordinating Vice President shall have the power of acceptance.

**17. Appendices A (Rate Computation), B-1 and B-2 (Sample NSI Regular Data Analyses) and C (Local Reference Supplement),** as it may be amended by NielsenTV from time to time and provided to Client, as attached hereto and acknowledged as received by Client, are hereby incorporated in this Agreement with the same full force and effect as though specifically set forth herein.

**18. Counterparts.** This Agreement may be executed in two or more counterparts, each of which will be deemed an original, but all of which together will constitute one and the same instrument.

**19. Entire Agreement.** This Agreement constitutes the entire agreement between the parties with respect to the subject matter hereof, and replaces all prior negotiations and agreements, whether oral or written, with respect to the subject matter.

AGREED AND ACCEPTED:

NIELSEN MEDIA RESEARCH, INC.
SCHAUMBURG, ILLINOIS

| | |
|---|---|
| | **Sunbeam Television Corp.** |
| | *(CLIENT full legal name)* |
| Signed: _[signature]_ | Signed: _[signature]_ |
| | *(duly authorized officer or agent)* |
| Title: Coordinating Vice President | Name: (Print/Type) **ROBERT W. LEIDER** |
| Date: 11/02/07 | Title: **EVP & G.M.** |
| | Date: **10-15-07** |

8

MMST wod 102006

## Appendix A
to
## NIELSEN STATION INDEX SERVICE AGREEMENT
### (Commercial Television Stations in Metered and Local People Meter Markets)
Date of Proposal: 10/4/07
between

Nielsen Media Research, Inc. and Sunbeam Television Corp. for television station see Appendix A  serving
Client's Market see Appendix A

Agreement Effective Date: January 1, 2008

| Station | Near the City of | Market | First Monthly Data Analyses | Channel Number | Network Affiliation | Regular Data Analyses per year |
|---------|------------------|--------|------------------------------|----------------|---------------------|--------------------------------|
| WHDH-TV | Boston | Boston, MA (Manchester, NH) | 1/31/2008 | 7 | NBC | 12 |
| WLVI-TV | Boston | Boston, MA (Manchester, NH) | 1/31/2008 | 56 | CW | 12 |
| WSVN-TV | Miami | Miami-Ft. Lauderdale, FL | 1/31/2008 | 7 | FOX | 6 effective 10/1/08 12 |

## I.  TARGET SAMPLE SIZE

### A.  Meter

| Station/Market: | WSVN-TV |
|-----------------|---------|
|  | Miami-Ft. Lauderdale, FL |
| Effective Date: | January 1, 2008 |
| Installed Households: | 500 |
| Estimated Average Day In-Tab: | 425 |
| Minimum for Publication: | 180 |

### Local People Meter

| Station/Market: | WHDH-TV | WLVI-TV | WSVN-TV |
|-----------------|---------|---------|---------|
|  | Boston, MA (Manchester, NH) | Boston, MA (Manchester, NH) | Miami-Ft. Lauderdale, FL |
| Effective Date: | January 1, 2008 | January 1, 2008 | October 1, 2008 |
| Installed Households: | 600 | 600 | 600 |
| Estimated Average Day In-Tab: | 510 | 510 | 510 |
| Minimum for Publication: | 210 | 210 | 210 |

### B.  Diary (Monthly Analysis)

DMA Target In-Tab Diary Households
**Target**

| Station/Market: | WSVN-TV |
|-----------------|---------|
|  | Miami-Ft. Lauderdale, FL |
| Effective Date: | 1/1/08-9/30/08 |
| October | 1340 |
| November | 1340 |
| January | 1210 |
| February | 1340 |
| May | 1340 |
| July | 1265 |

9

MMST wod 102006

Appendix A
to
## NIELSEN STATION INDEX SERVICE AGREEMENT
*(Commercial Television Stations in Metered and Local People Meter Markets)*
Date of Proposal: 10/4/07
between
Nielsen Media Research, Inc. and Sunbeam Television Corp. for television station see Appendix A serving Client's Market see Appendix A

II. REGULAR DATA ANALYSES PER YEAR

a. See Appendix A Monthly Data Analyses. Months reported shall be those checked below.

b. 365 Daily DMA Ratings

III. MONTHLY BASE RATE (See Section B.2., C.1(a), and C.5 of the Agreement).

| | | WHDH-TV | WLVI-TV | WSVN-TV |
|---|---|---|---|---|
| | | Boston, MA (Manchester, NH) | Boston, MA (Manchester, NH) | Miami-Ft. Lauderdale, FL |
| 1/1/2008 | 9/30/2008 | $94,034 | $49,300 | $65,711 |
| 10/1/2008 | 9/30/2009 | $95,914 | $50,286 | $78,853 |
| 10/1/2009 | 9/30/2010 | $98,792 | $51,794 | $81,219 |
| 10/1/2010 | 9/30/2011 | $102,744 | $53,866 | $84,468 |
| 10/1/2011 | 9/30/2012 | $106,853 | $56,021 | $87,847 |

~~In each succeeding year following the completion of the Minimum Duration, a new Monthly Base Rate shall be established by applying a fifteen percent (15%) increase over the prior year's Monthly Base Rate. Such adjustment shall be applied prior to application of any discounts or surcharges.~~ This Paragraph was intentionally deleted from this Agreement.

IV. SATELLITE(S) TO PARENT STATION:

A. The following satellite stations comply with Appendix C, Parent/Satellite Reporting Policy and are subject to Section C.3. of this Agreement.

| Call Letters | City and State | NSI Market | Surcharge |
|---|---|---|---|
| | | | |
| | | | |
| | | | |

B. In the event that this Agreement is terminated for any reason as to any of the above satellites, each satellite's charges for the terminal year will be calculated as per Section C.10 herein. In such event, the terms of this Agreement will remain in full force and effect for the Parent Station and remaining satellite(s), if any.

C. All terms of this Agreement other than this Section IV. shall apply equally to the Parent Station and satellite station(s).

10

MMST wod 102006

Appendices B-1 and B-2
to
**NIELSEN STATION INDEX SERVICE AGREEMENT**
*Commercial Television Stations In Metered and Local People Meter Markets*

Sample NSI Regular Analyses Following this Page

11

MMST wod 102006

Appendix C
to
**NIELSEN STATION INDEX SERVICE AGREEMENT**
*Commercial Television Stations in Metered and Local People Meter Markets*

**Local Reference Supplement Following this Page**

12

JS 44 (Rev. 2/08)

# CIVIL COVER SHEET

FILED by D.C.
ELECTRONIC
Apr. 30, 2009
STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. - MIAMI

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.) NOTICE: Attorneys MUST Indicate All Re-filed Ca:

## I. (a) PLAINTIFFS

SUNBEAM TELEVISION CORP.

**(b)** County of Residence of First Listed Plaintiff **Broward**
(EXCEPT IN U.S. PLAINTIFF CASES)

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

Elaine Johnson James, Esq.
Edwards Angell Palmer & Dodge LLP
One No. Clematis St., Suite 400
West Palm Beach, FL 33401; 561.833.7700

**(d)** Check County Where Action Arose: ☐ MIAMI- DADE ☐ MONROE ☒ BROWARD ☐ PALM BEACH ☐ MARTIN ☐ ST. LUCIE ☐ INDIAN RIVER ☐ OKEECHOBEE HIGHLANDS

## DEFENDANTS

NIELSEN MEDIA RESEARCH, INC.

County of Residence of First Listed Defendant **Borough of Manhattan New York City**
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT LAND INVOLVED.

Attorneys (If Known) Leslie Gordon Fagen, Esq.
Paul Weiss Rifkind Wharton & Garrison LLP
1285 Avenue of the Americas
New York, NY 10019-6064

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1 U.S. Government Plaintiff
☒ 3 Federal Question (U.S. Government Not a Party)
☐ 2 U.S. Government Defendant
☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

*handwritten:* 09 CV 60637 HUCK/ O'SULLIVAN

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

### CONTRACT
☐ 110 Insurance
☐ 120 Marine
☐ 130 Miller Act
☐ 140 Negotiable Instrument
☐ 150 Recovery of Overpayment & Enforcement of Judgment
☐ 151 Medicare Act
☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans)
☐ 153 Recovery of Overpayment of Veteran's Benefits
☐ 160 Stockholders' Suits
☐ 190 Other Contract
☐ 195 Contract Product Liability
☐ 196 Franchise

### REAL PROPERTY
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

### TORTS
**PERSONAL INJURY**
☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers' Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury

**CIVIL RIGHTS**
☐ 441 Voting
☐ 442 Employment
☐ 443 Housing/ Accommodations
☐ 444 Welfare
☐ 445 Amer. w/Disabilities - Employment
☐ 446 Amer. w/Disabilities - Other
☐ 440 Other Civil Rights

**PERSONAL INJURY**
☐ 362 Personal Injury - Med. Malpractice
☐ 365 Personal Injury - Product Liability
☐ 368 Asbestos Personal Injury Product Liability

**PERSONAL PROPERTY**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**PRISONER PETITIONS**
☐ 510 Motions to Vacate Sentence
**Habeas Corpus:**
☐ 530 General
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

### FORFEITURE/PENALTY
☐ 610 Agriculture
☐ 620 Other Food & Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 R.R. & Truck
☐ 650 Airline Regs.
☐ 660 Occupational Safety/Health
☐ 690 Other

**LABOR**
☐ 710 Fair Labor Standards Act
☐ 720 Labor/Mgmt. Relations
☐ 730 Labor/Mgmt.Reporting & Disclosure Act
☐ 740 Railway Labor Act
☐ 790 Other Labor Litigation
☐ 791 Empl. Ret. Inc. Security Act

**IMMIGRATION**
☐ 462 Naturalization Application
☐ 463 Habeas Corpus-Alien Detainee
☐ 465 Other Immigration Actions

### BANKRUPTCY
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**PROPERTY RIGHTS**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**SOCIAL SECURITY**
☐ 861 HIA (1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g))
☐ 864 SSID Title XVI
☐ 865 RSI (405(g))

**FEDERAL TAX SUITS**
☐ 870 Taxes (U.S. Plaintiff or Defendant)
☐ 871 IRS—Third Party 26 USC 7609

### OTHER STATUTES
☐ 400 State Reapportionment
☒ 410 Antitrust
☐ 430 Banks and Banking
☐ 450 Commerce
☐ 460 Deportation
☐ 470 Racketeer Influenced and Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Sat TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/ Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 890 Other Statutory Actions
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 895 Freedom of Information Act
☐ 900 Appeal of Fee Determination Under Equal Access to Justice
☐ 950 Constitutionality of State Statutes

## V. ORIGIN (Place an "X" in One Box Only)

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Re-filed- (see VI below)
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. RELATED/RE-FILED CASE(S).
(See instructions second page):
a) Re-filed Case ☐ YES ☒ NO b) Related Cases ☐ YES ☒ NO

JUDGE                DOCKET NUMBER

## VII. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing and Write a Brief Statement of Cause (Do not cite jurisdictional statutes unless diversity): *15 U.S.C. § 26*

Section 2 of the Sherman Antitrust Act *15 U.S.C. § 2*

LENGTH OF TRIAL via **10** days estimated (for both sides to try entire case)

## VIII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes ☐ No

ABOVE INFORMATION IS TRUE & CORRECT TO THE BEST OF MY KNOWLEDGE

SIGNATURE OF ATTORNEY OF RECORD *Elaine Johnson James*

DATE April 30, 2009

FOR OFFICE USE ONLY
AMOUNT 350.00   RECEIPT # 725779   IFP

57 of 57