**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**CASE NO. 09-60637-CIV-HUCK/O'SULLIVAN**

SUNBEAM TELEVISION CORP.,

      Plaintiff,

v.

NIELSEN MEDIA RESEARCH, INC.,

      Defendant.

_____/

**PARTIAL ORDER ON SUMMARY JUDGMENT**

This matter is before the Court on Defendant Nielsen Media Research, Inc.'s Motion for Summary Judgment (D.E. # 94), filed September 21, 2010. The Court has considered the extensive briefing and record in this matter, and held oral arguments. For the following reasons, the Motion is granted as to the federal and state antitrust claims. The Court shall defer ruling on the remaining counts—breach of contract and violation of Florida's Deceptive and Unfair Trade Practices Act—until supplemental briefing has been submitted and considered.

**Factual Allegations**

Nielsen is one of the world's leading providers of television audience measurement services. Sec. Am. Compl. ¶ 1. Nielsen provides viewership ratings for television stations, including broadcast and cable. Nielsen sells its ratings information, by way of subscription, to a variety of users, including television stations, cable operators, networks, advertisers, advertising agencies, media sales representatives, television content developers and providers and television viewers. Since 1993, Nielsen has effectively been the sole provider of such services in the United States.[1] *Id.* Nielsen is therefore the only viewership ratings provider in the Miami-Fort Lauderdale television market, in which Plaintiff Sunbeam Television Corporation operates WSVN, a FOX-

---

[1] Arbitron Inc. was, until 1993, a competitor of Nielsen's in the television viewership ratings business, and is currently the dominant provider of radio ratings in the United States.

affiliated, broadcast television channel. *Id.* Pursuant to a non-exclusive contract, Sunbeam receives Nielsen's ratings data.

Ratings are the currency of television media. Ratings directly affect the prices at which advertisements—a television station's principal source of income—are sold. *Id.* ¶ 2. Nielsen employs or has employed three methods for collecting raw viewership sampling data from which it generates extrapolated ratings: Diary, Meter-Diary, and People Meter. *Id.* ¶ 45. The Diary method requires selected sample viewers to manually record in diary form the television shows they watch. *Id.* ¶ 46. The Meter-Diary method combines the Diary method, which is employed in some selected sample homes, with recovered automated information from electronic meters installed in other selected homes. *Id.* ¶ 48. The People Meter method combines the electronic meter, which broadly tracks house-wide viewership, with a remote control that enables Nielsen to determine which specific individual is viewing a particular program by requiring the viewer to press a unique identifying button on the remote control. *Id.* ¶ 50. The People Meter does not require the viewer to maintain detailed written records, and is thus more passive than the Diary method, though it does require active participation in the form of using the identifying remote control buttons.

An important characteristic of television viewership is that with regard to proportion, it is a zero-sum phenomenon or "closed universe." Represented in percentage terms, total (100%) television viewership is static, though the percentage of viewership allocated to any channel is dynamic and inversely proportional to the percentages allocated to other channels. A greater percentage-allocation of total viewership must come at a competitor's expense, and a lesser one to a competitor's advantage. Another overarching reality in this case is that viewership sampling is an imprecise undertaking, and the parties agree that all sampling methodologies have flaws.[2]

This case arises out of controversy surrounding Nielsen's October 2008 implementation of its Local People Meter methodology, a People Meter method replacing the Meter-Diary method in the Miami-Fort Lauderdale television market. *Id.* ¶ 3.

---

[2] Sampling involves selecting a small subset of the population intended to be representative of the population at large, and extrapolating generalized population-wide information from the behavior or preferences of the sample. The degree of error in any sampling is the extent to which the sample does not adequately represent the population at large. Obviously, measuring the behavior or preferences of a sample is never as accurate as taking the same measurements of each member of the population at large.

Sunbeam alleges that Nielsen implemented Local People Meters despite its knowledge that certain demographic groups—in particular, minorities—do not use the technology properly, leading to inaccurate ratings. *Id.* ¶ 57. Sunbeam alleges that this practice has drawn the criticism of customers, minority groups, advertisers, and congressional leaders, and contravenes an industry association's recommendations. *Id.* Sunbeam further alleges that this flaw can be corrected by modifying survey methodology and statistics. *Id.* ¶ 82. The consequences of the change to the Local People Meter methodology have been profound: a dramatic reduction in WSVN's ratings—in some cases by as much as fifty percent—resulting in lost advertising revenue of $1 million per month and a $100 million decrease in WSVN's going-concern value. *Id.* ¶ 10.

Sunbeam contends that its injury is the result not merely of a defective ratings product, but of antitrust violations. Sunbeam alleges that Nielsen engaged in the following exclusionary and monopolistic conduct: (1) mandating contract provisions that prevent competitors from entering the market; (2) undertaking transactions and business strategies intended to neutralize actual or potential competitors; (3) imposing punitive pricing on customers who resist its practices; (4) utilizing defective ratings data to attract and retain new cable customers, thereby foreclosing a potential avenue of competitor entry; (5) imposing on its customers onerous contract provisions that, *inter alia*, leave them with no effective contractual recourse in the event of breach; and (6) charging non-competitive prices for its rating services. *Id.* ¶ 13.

The operative Second Amended Complaint contains claims for violation of the Sherman Antitrust Act (Count I), violation of the Florida Antitrust Act (Count II), violation of the Florida Deceptive and Unfair Trade Practices Act (Count III), and breach of contract (Count IV).

## Analysis

On this Motion for Summary Judgment, the Court must determine if, in light of the record evidence, there exist disputed issues of material fact concerning each of the claims in the Second Amended Complaint. To the extent this is the case, each such claim must proceed to trial.

Section two of the Sherman Act prohibits monopolization or attempts "to monopolize . . . any part of the trade or commerce among the several States . . . ." 15

U.S.C. § 2.[3]  Such claims must be adjudicated with care and precision.  The line demarcating legitimate, successful commercial activity and anticompetitive conduct can be difficult to draw, and the consequences of error severe for both the defendant and the market at large.  The Court is mindful that "mere possession of monopoly power is not illegal."  *Byars v. Bluff City News Co., Inc.*, 609 F.2d 843, 853 (6th Cir. 1979).  The law does not punish monopoly power resulting from "superior product, business acumen, or historic accident."  *U.S. v. Grinnell Corp.*, 384 U.S. 563, 571 (1966).  The parties agree that the relevant product is market television audience measurement and that the relevant geographical market is the Miami-Fort Lauderdale television advertising area.  Nielsen does not dispute that it exercises monopoly power in this product market.  Thus, the relevant inquiry is whether Sunbeam has suffered "antitrust injury" as the result of Nielsen committing "predatory or exclusionary acts or practices that have the effect of preventing or excluding competition within the relevant market."  *Morris Commc'ns Corp. v. PGA Tour, Inc.*, 364 F.3d 1288, 1294 (11th Cir. 2004).

A threshold issue pervading the antitrust inquiry is the extent to which alleged exclusionary conduct on a national basis is relevant to claims involving an identified local market.  The geographical market in this case is Miami-Fort Lauderdale.  Yet much of the evidence of exclusionary conduct and potential competition implicates national-level activity: national contracting practices and potential national competitors.  Despite Nielsen's protestations to the contrary, such evidence is relevant insofar as the national conduct has the natural consequence of foreclosing intended local competition and causing local antitrust injury.

## A. Exclusionary Conduct

### 1. Contracting Practices

Sunbeam contends that Nielsen excludes competition by employing staggered termination dates in its major subscription contracts and requiring its customers, upon termination of their subscriptions, to return and cease using historical ratings data. Nielsen responds that its contracts are non-exclusive (allowing customers to purchase

---

[3] The federal and state antitrust claims are analyzed together, because "[t]he facts underlying the state and federal antitrust claims are the same, and Florida's antitrust statutes are very similar to the federal statutes." *AvMed, Inc. v. Sheridan Healthcorp, Inc.*, No. 09-CIV-23851 (PCH), 2010 WL 3008811, *7 (S.D. Fla. July 28, 2010).

others' ratings products), customers pick the duration of their contracts, no "critical mass" of customers was tied up under Nielsen's contracts, and Nielsen has no duty to assist potential competitors by providing historical ratings information.

### a. Staggered, Long-Term Contracts

A policy or practice of intentionally staggering contract terms may, under some circumstances, constitute anticompetitive conduct, *erinMedia, LLC v. Nielsen Media Research, Inc.*, No. 8:05-cv-1123, at 4-5 (M.D. Fla. Dec. 28, 2007) (unpublished decision); *Insignia Systems, Inc. v. News Am. Marketing In-Store, Inc.*, 661 F. Supp. 2d 1039, 1065 (D. Minn. 2009), though it must be one that forecloses a substantial share of the market, *ee E. Food Servs., Inc. v. Pontifical Catholic Univ.*, 357 F.3d 1, 8 (1st Cir. 2004).

There is some evidence that Nielsen has a policy or practice of staggering the terms of certain of its national market contracts.  These are its "Master Service Agreements" or "corporate contracts" with Time Warner, NBC Universal, News Corporation, and CBS, which, for each of these entities, consolidates all existing contracts for numerous local and national products and services into a single master agreement.  Dep. of Sara Erichson, Ex. 128, at 55:22-61:23.  The reasons for this policy are in dispute.  Nielsen maintains that it staggers these corporate contracts because they require enormous effort to negotiate, and it would be burdensome to negotiate numerous large contracts simultaneously.  Sunbeam counters that the policy is a strategy intended to impede a competitor's market entry by foreclosing substantial market share at any given entry point.  Nielsen also argues, and Sunbeam does not dispute, that Nielsen does not have a policy or practice of staggering the terms of its customer contracts in Miami. However, Sunbeam responds that Nielsen's national contracting conduct "ripples into the local markets, including Miami, and continues the desired effect of discouraging competition on both the national and local level."  Sunbeam's Disputation of Nielsen's Statement of Undisputed Facts (D.E. # 116) ¶ 119.  *See also* Expert Report of Richard Rapp, Ex. 95, ¶¶ 103-115.

According to Sunbeam, "Nielsen's policy of staggering national and station group contracts had the effect of locking up 88% of the Miami market in the two years preceding the [Local People Meter] launch." Sunbeam's Disputation ¶ 120.  Nielsen

responds that during the three-year window from March 2006—when Arbitron and Nielsen ceased their joint venture to develop a new ratings technology, Passive People Meters, as discussed more fully below—until June 2009—when Nielsen launched the Local People Meter methodology in Miami—65% of the business in the Miami market became available because of expiring contract terms (though not necessarily all at the same time). Mot. for Summ. J. at 23.  The question of substantial foreclosure of the market is therefore material and disputed.  Nor can Nielsen maintain, on this record, that there is no disputed issue as to its motivation for staggering the corporate contracts. Sunbeam cites an internal Nielsen presentation entitled "Nielsen Media Research Medium Term Plan 2004-2006" which lists "[s]taggered renewals" as a "[c]ontract strategy" for "[w]inning and retaining all potential clients."  Ex. 126, at NIE00035635. This could give rise to a reasonable inference that the policy sought exclusionary ends, rather than, as Nielsen claims, a reduction of the administrative burden of simultaneously negotiating and executing large agreements.[4]  *See* Expert Report of Richard Rapp, Ex. 95, ¶ 104 ("The staggering of contracts can . . . impede would-be competitors.").

Nielsen also argues that regardless of the existence of staggering and the intentions behind the practice, its contracts were not exclusive—its customers were never contractually precluded from purchasing additional ratings information from a competitor—and thus could not have anticompetitive effect.  It is not clear, however, whether customers would nonetheless have been significantly deterred from purchasing competing ratings.  *Compare* April 19, 2007 Dep. of CBS Chief Research Officer and President of CBS Vision David Poltrack, Ex. 39, at 188:19-24 ("Q. Would [CBS] be able to find the resources to purchase such a service, if [erinMedia] had a service? A. Subject to a cost/benefit analysis and normal business analysis, obviously we could find the money."); *with id.* at 212:14-22 ("It would have—the process would have been done on a cost/benefit basis.  Obviously the corporation has the funds, but we would do the analysis on the basis of a cost/benefit analysis, so we would have to actually show management the generation of more than $50 million in incremental profits in a business analysis.  I cannot imagine at that point in time we would have ever been able to do that."); Expert

---

[4] Were it as Nielsen contends, one might expect "staggered renewals" to appear as a "contract strategy" to "reduce administrative burden," rather than to win and retain clients.

Report of Patrick Mullen, Ex. 71, at 45 ("Although Tribune was very interested in encouraging, including providing financial support, to [sic] a viable Nielsen competitor, Tribune could not pay a new television audience measurement provider $17 million, or a fraction of that amount, while it was still required to pay Nielsen in excess of $17 million."). Sunbeam's expert economist opined that Nielsen's contracts "effectively compelled exclusivity" and that, "[g]iven the combination of long-term contracts, the absence of termination rights for customers, and the staggered contract expiration dates, any entrant would face an extremely slow rate at which it could expect to gain customers." Expert Report of Richard Rapp, Ex. 95, ¶¶ 107, 115. On this record, whether Nielsen's contracting practices are exclusionary is a disputed factual issue.

### b. Historical Ratings

Nielsen's non-exclusive contracts provide customers a subscription to its ratings data, and require the data's return upon termination of the subscription. Nielsen prohibits customers from retaining or using past periods' ratings after their contracts with Nielsen have expired. Sunbeam considers this conduct exclusionary in that it makes it difficult, for an initial one-year period, to avoid the expense of having to purchase ratings simultaneously from both Nielsen and its potential rival, a proposition too costly for some customers. *See id.* ¶¶ 124-130. As Sunbeam's expert opines, when a rival attempts to introduce a new ratings method, potential customers are likely to require historical data for comparative and evaluative purposes. *Id.* As new ratings are not instantaneously generated, and can involve substantial lag time, customers subscribing to a rival's new product would have to rely on Nielsen's historical ratings until such time as the rival's new ratings were issued. *Id.* Nielsen contends that its ratings data is independently created at great expense and that even a monopolist has no duty to facilitate competition by sharing its resources with rivals.

Claims such as Sunbeam's—that it is exclusionary for Nielsen to require return of its historical ratings data—are generally analyzed within antitrust law as "refusals to deal" or denials of access to "essential facilities." Historically, courts had been receptive to such claims. For example, in *Multistate Legal Studies, Inc. v. Harcourt Brace Jovanovich Legal and Professional Publications, Inc.*, 63 F.3d 1540 (10th Cir. 1995), the plaintiff, a provider of a supplemental bar review course, alleged that defendants,

providers of comprehensive bar review courses, attempted to monopolize the supplemental market by deliberately scheduling their courses so as to create conflicts with plaintiff's course.  Defendants protested that they had no duty to assist a competitor by rearranging their schedules.  Finding that the plaintiff offered sufficient circumstantial evidence that the scheduling conflicts were deliberate and unjustified, which included a showing that such conflicts increased after plaintiff's rejection of defendants' proposed market-allocation agreement, the Tenth Circuit reversed the district court's grant of summary judgment to the defendants.

The Supreme Court reached a similar conclusion in *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985).  There, the defendant—owner of three of four adjoining ski slopes—had for some time, with the plaintiff—owner of the fourth slope—jointly sold to skiers a single pass to all four slopes, with the revenue divided among the owners based on slope usage.  This was particularly beneficial to the plaintiff, because its slope, while receiving significant usage under the parties' arrangement, would be substantially less attractive to skiers if they could not also ski the other three slopes. The Court found violation of the Sherman Act based on defendant's termination of the joint undertaking and refusal to sell to the plaintiff passes to the defendant's three slopes even at the regular market price offered to skiers.  The defendant's decision to cease participation in a profitable voluntary joint venture, without which the plaintiff would suffer significant commercial harm, suggested a willingness to forsake short-term profits to achieve an anticompetitive end.  "*Aspen Skiing* [taught] that a monopolist may have to continue to deal with a competitor when doing so would enhance consumer welfare, when the monopolist is aware of this welfare benefit, and when the monopolist can show no offsetting benefit to consumers from an efficiency achieved by means of the monopolist's exclusionary conduct."  Lawrence A. Sullivan & Warren S. Grimes, *The Law of Antitrust: an Integrated Handbook* 130 (2d ed. 2006).

A 2004 Supreme Court decision, however, appears to have limited the applicability of the duty to deal/essential facility doctrine, placing its contours in some doubt.  In *Verizon Communications Inc. v. Law Offices of Curtis V. Trinko*, 540 U.S. 398 (2004), consumers of AT&T, which was competing with incumbent Verizon to provide local telephone service, brought suit against Verizon alleging that its refusal to grant

AT&T access to Verizon's local telephone exchange networks violated, *inter alia*, the Sherman Act.  The Supreme Court found no actionable refusal to deal, noting that Verizon's obligations were the subject of an extensive regulatory framework and that Verizon had not historically provided its competitors with the assistance at issue— namely, access to the local telephone network infrastructure that it controlled.  *Trinko* distinguished *Aspen Skiing* as "at or near the outer boundary of §2 liability," noting that *Aspen Skiing* involved a decision to "cease participation in a cooperative venture" and a refusal to deal even on terms available to the rest of the market.  *Id.* at 409-410.  The Court added that courts must exercise caution in this area "because of the uncertain virtue of forced sharing and the difficulty of identifying and remedying anticompetitive conduct by a single firm."  *Id.* at 408.  *Trinko*'s lessons, however, are somewhat unclear.  As one commentator notes, "[i]t is uncertain whether the Court would have reached the same result had 1996 Federal legislation not already imposed an FCC regulated duty on Verizon to deal with its local rivals.  Nonetheless, the tone of the Court's opinion suggests a strong inclination not to extend the law governing a monopolist's duty to deal."  Sullivan & Grimes, *supra*, at 131.

A recent decision illustrates the lack of clarity over the extent to which a monopolist must "assist" a competitor and the import of *Trinko* and *Aspen Skiing*.  In *In re Educational Testing Service Praxis Principles of Learning and Teaching: Grades 7-12 Litigation*, 429 F. Supp. 2d 752 (E.D. La. 2005), the plaintiffs alleged that the defendant—which devised and administered state-sanctioned professional aptitude examinations and produced commercial preparatory material—refused to make its test booklets and answer sheets available to either test takers or competing examination producers and preparers, in violation of the Sherman Act.  The court dismissed the claim, though its reasons appear to pull in different directions, one suggesting a rigid adherence to *Trinko* ("There is no allegation that [defendant] changed a profitable course of dealing with a competitor to the detriment of that competitor"), the other suggesting a flexible approach with the court considering whether there was actual anticompetitive effect regardless of whether the defendant had ever provided such assistance in the past ("plaintiffs concede that two other companies are capable of developing marketable teacher certification tests without any help from [defendant]").  *Id.* at 758-59.

Perhaps *Trinko*'s emphasis on the fact that *Aspen Skiing* involved a decision to terminate a pro-consumer, cooperative arrangement should be viewed pragmatically from an evidentiary perspective. *See* Sullivan & Grimes, *supra*, at 130. The original cooperation, which benefited both slope owners, demonstrated financial and administrative feasibility, and the arrangement's popularity among consumers evinced the market's favorable preference. These specific factors strongly suggested that the defendant slope owner's decision was anticompetitive. Thus, there was no need for the Court to divine anticompetitive purpose and effect.

Admittedly, the current state of refusal to deal/essential facility jurisprudence is somewhat uncertain. The Court finds the following rule, which seems to have implicitly emerged, the most sensible reconciliation of *Trinko* and *Aspen Skiiing*. Generally, a monopolist has no duty to assist its (potential) rival by dealing with it or providing it access to the monopolist's facility, especially where that rival can reasonably develop, on its own, the resource it seeks from the monopolist, or where the monopolist has acquired the resource through its own competitive and industrious effort (rather than, for instance, a government-granted monopoly, such as is commonly conferred to utility providers). Where, however, specific compelling factors suggest anticompetitive purpose and effect in a manner which alleviates concern over ambiguous evidence and tenuous inferences, as they did in *Aspen Skiing*, the case may be within that actionable "outer boundary of §2 liability."

While Nielsen's policy of prohibiting post-subscription retention of ratings data may make it more difficult for competitors to enter the market, there is no record evidence to suggest—consistent with the evidentiary requirements of *Trinko* and *Aspen Skiing*—both anticompetitive purpose and effect with regard to this specific conduct. Nor does the conduct constitute a complete refusal to deal or denial of access to an essential facility, for the ratings information is available by continued subscription. If *Aspen Skiing* was at the "outer boundary," Nielsen's alleged refusal to deal/denial of access to an essential facility falls outside that boundary.

The difficulty in this case, however, is that the ratings-retention policy is not the sole alleged exclusionary practice. It is not clear whether *Trinko* is to be applied on a case-wide basis, accounting for all alleged instances of exclusionary conduct, or applied

individually and discretely to each alleged instance of exclusionary conduct. That is, if there is not sufficient evidence that the ratings-retention policy had anticompetitive purpose and effect, can the issue nonetheless survive summary judgment if there is other evidence—such as contract term staggering—of anticompetitive purpose and effect? Is each alleged form of anticompetitive conduct to be separately analyzed under *Trinko*, or can a lack of evidence of anticompetitive purpose and effect as to one form of conduct be mitigated by substantial evidence as to another? In *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690 (1962), the Supreme Court held that it was error for a lower court to have divided an antitrust conspiracy case into five separate episodes, and assessed the sufficiency of plaintiffs' case as to each episode as though it were a separate lawsuit. The Court observed that "plaintiffs should be given the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each," and that the "character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole ..." *Id.* at 699. *Continental Ore* recognizes that exclusionary conduct can have cumulative effect, and raises the possibility of a case-wide application of *Trinko*. On the other hand, the monopolist's precarious position cannot be overlooked. How is it to assess the amorphous cumulative effect of conduct that may, standing alone, be lawful? This tension underlies antitrust jurisprudence, and one can only hope that appellate courts have an opportunity to resolve it in the near future. Nonetheless, in light of *Trinko*, the Court feels constrained to hold that Nielsen's ratings-retention policy, falling beyond the "outer boundary of §2 liability," does not present a disputed factual issue.

### 2. The Arbitron Joint Venture

Arbitron competed with Nielsen in the local television ratings business and held a substantial share of that market until its exit in 1993, after which it focused exclusively on radio ratings. In the late 1990s, Arbitron began developing and testing Passive People Meters—a new ratings technology which utilizes pager-sized devices that viewers wear in order to capture encoded television signals. These devices are passive in that they record an individual's viewing activity without requiring any action of the individual, whereas Nielsen's People Meter requires the viewer to actively push a remote control

button. Sunbeam claims that Nielsen prevented introduction of Passive People Meter technology by entering into an option agreement with Arbitron which, if the option were exercised, granted Nielsen exclusive control over deployment of Passive People Meters in the U.S. television market, while Arbitron retained rights over their deployment in the radio market. Nielsen responds that its option was non-exclusive, permitting Arbitron unilaterally to grant option rights to another party and that, in any event, in March 2006, Nielsen ultimately declined to exercise its option, leaving Arbitron free to implement Passive People Meter technology in the television market. Sunbeam replies that the non-exclusivity was illusory, because Nielsen held a right of first refusal. Sunbeam adds that in prematurely implementing Local People Meter technology, Nielsen made the market even more inhospitable to introduction of Passive People Meters by tying its customers to Local People Meters and decreasing the market's appetite for yet another ratings technology.

There is equivocal circumstantial evidence suggesting that Nielsen entered into the joint venture for exclusionary purpose. *See* Nielsen Media Research 2002 MTP Process, Ex. 168, at NIE-EM00148697 (Nielsen business plan characterizing Arbitron's passive technology as "threat to planned rollout to LPM" and listing "[p]artnering with Arbitron" as one of the "[s]olutions"). Nevertheless, an exclusionary purpose cannot overcome an absence of harm to competition. There is no dispute that Nielsen paid a substantial sum of money for the option, and that Nielsen poured millions of dollars into the joint venture. If anything, Arbitron benefited from the option fees and investment capital. Nor is there any dispute that Nielsen declined to exercise the option, and that Arbitron was then free to implement and market the technology or assign it to others as it saw fit, with the benefit of Nielsen's substantial investment. These facts do not present an issue sufficient to survive summary judgment.

### 3. Local People Meter Rollout: Inferiority and Misrepresentation

Sunbeam contends that Nielsen's implementation of Local People Meters constitutes both exclusionary conduct and antitrust injury. If Nielsen excluded a superior methodology through monopolistic conduct, the causally related harm that Sunbeam suffered by virtue of Nielsen's allegedly defective product constitutes its antitrust injury, much as any consumer is harmed by a monopolist's defective product. But Sunbeam

ascribes an additional role to Local People Meter implementation: that it was undertaken for anticompetitive effect. Thus, Local People Meter implementation must be analyzed as both an exclusionary act and a form of antitrust injury.

Product changes are not, standing alone, within the province of the Sherman Act. *See Oahu Gas Serv., Inc. v. Pacific Resources Inc.*, 838 F.2d 360, 369 (9th Cir. 1988) ("A line of 'product innovation' cases has consistently rejected antitrust liability for a monopolist's decision about when or whether to market new products."). If the change is positive, antitrust suits could stifle innovation. If the change is deleterious, it is often precisely the kind of activity that spurs competition; after all, rivals typically relish the opportunities presented by another's defective product. And in any event, courts and jurors are generally ill-suited to the task of adjudicating the relative merits of complex products and services, a task more appropriately undertaken by the market. In view of these concerns, product implementation is only actionable if it threatens to hinder the market's ability to exercise its invisible hand, that is, if it "involve[s] some associated conduct which constitutes an anticompetitive abuse or leverage of monopoly power, or a predatory or exclusionary means of attempting to monopolize the relevant market." *Foremost Pro Color, Inc. v. Eastman Kodak Co.*, 703 F.2d 534, 545-46 (9th Cir. 1983). *See* IIIB PHILLIP E. AREEDA & HERBERT HOVENKAMP, ANTITRUST LAW ¶ 781 (3d ed. 2006) ("We therefore conclude that all product innovation should be lawful in the absence of bundling, setting aside only the possible case where investment in innovation is used to facilitate predatory pricing.").

Misrepresentations may in certain circumstances constitute such associated exclusionary conduct. Thus, if Nielsen's implementation of Local People Meters was accompanied by misrepresentations made for and with anticompetitive effect, actionable antitrust injury may exist. *See In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516 (3d Cir. 2004) (affirming certification of class in antitrust action involving allegations that pharmaceutical company sought to preclude market-adoption of generic drug by misrepresenting that it was not bioequivalent to the company's non-generic).

Sunbeam argues that Nielsen hastily implemented and forced on its consumers— through misrepresentation—severely flawed Local People Meter technology in an effort to stave off the threat of competitive technology and capture the cable television ratings

13

market.  Arbitron, as noted, was developing passive technology, and with the advent and rapid adoption of cable television, cable operators were in a position to develop another methodology utilizing "set-top box" data—viewership information that could be extracted directly from in-home cable boxes that most cable subscribers possess.  Cable operators were also concerned with existing methodological flaws that they felt unduly benefited broadcast stations, including Sunbeam's, and resulted in inaccurately low cable television station ratings.  Sunbeam claims that Nielsen placated the cable operators' ratings concerns and removed their incentive to develop competing technology by promising in advance that Local People Meters would lead to higher cable ratings.  Sunbeam alleges that Local People Meter technology suffers from numerous flaws, including Nielsen's inability to develop a reliable random sample from which to extrapolate ratings data, and inaccuracies resulting from non-compliance due to the burdens placed on sample participants by the button-pushing requirements and the two-year length of sampling (as compared to the one-week length of sampling in the Meter-Diary method).  According to Sunbeam, non-compliance is most acute when minority groups are being sampled, and uniquely harms Sunbeam, which has substantial minority viewership.  Nielsen responds that while all ratings technologies have limitations, Local People Meter technology has significant advantages over its predecessors, including higher cooperation rates, lack of reliance on paper diaries, data reporting for individual viewers on a daily basis, and the ability to more precisely capture time-shifted viewing.

The record reflects that Nielsen viewed the cable operators as a potential competitive threat.  There is some ambiguous evidence suggesting that Nielsen implemented Local People Meter technology to stave off that threat.  *See* Nielsen Media Research 2002 MTP Process, Ex. 168, at NIE-EM00148697 (describing that cable operators were "working on their own collection systems," and noting among potential solutions that Nielsen "may need to modify our LPM Plan").  However, the record does not support Sunbeam's claim of Local People Meter inferiority.  To the contrary, Nielsen has proffered evidence supporting the claimed superiority of Local People Meter technology, and no Sunbeam witness, fact or expert, was willing to testify that it is inferior to the pre-existing Meter-Diary system.  When asked, Edmund Ansin, Sunbeam's president and 30(b)(6) witness, said, "I can't tell you which is a better methodology."

Dep. of Edmund Ansin, Ex. 16, at 154:25-155:7.  Patrick Mullen, Sunbeam's expert witness on the television industry, testified, "I don't know which one is better."  Dep. of Patrick Mullen, Ex. 19, at 90:18-22.  When asked whether he had any view on the superiority of either system, Eugene Ericksen, Sunbeam's expert statistician, noted that he couldn't "answer that conclusively because there has not been enough research."  Dep. of Eugene Ericksen, Ex. 22, at 70:5-18.  Acknowledging its lack of evidence, Sunbeam argues that Nielsen has refused to rigorously analyze whether Local People Meter technology is in fact superior to its predecessors, that only Nielsen has the ability to do so, but that it is nonetheless reasonable to simply suppose that Local People Meters are inferior.  *See* Pl.'s Surreply Mem. in Opp'n to Nielsen's Mot. for Summ. J. (D.E. # 154), at 2 ("The only way to determine the impact of these problems on ratings accuracy, and to adequately address them, is to conduct rigorous methodological research . . . Only Nielsen can conduct such research."); Rebuttal Report of Eugene Ericksen, Ex. 85, at 31 ("I am stunned by the lack of a research record comparing the accuracy of the meter-diary and LPM systems. . . . While there is no research record indicating which one is more accurate, the presumption has to be on the side of the meter-diary system.  The respondent burden on the diary-keeper listing the audience members for a one-week period is substantially less than the burden on all household members to keep pushing buttons for two years."); Expert Rebuttal Report of Gale Metzger, Ex. 86, ¶ 6 ("Nielsen's LPMs are not clearly superior to Meter-Diaries and it is reasonable to believe that Meter-Diaries are superior based on available research.").  *But see* Dep. of Gale Metzger, Ex. 223, at 121:18-20 ("I really believe that the Meter-Diary system is a more accurate reflection of the total audience than does [sic] the People Meter.").  Sunbeam adds that regardless of superiority on the national level, Local People Meters are inferior to the Meter-Diary method in the Miami-Fort Lauderdale market, as evidenced by dramatic ratings changes inconsistent with those experienced in other local markets transitioning to Local People Meters.

At most, the record reflects that Sunbeam could potentially establish at trial that Local People Meters, as do all existing methodologies, have serious flaws.  Sunbeam might also be able to establish that any flaws attending Local People Meters may be exacerbated in certain local markets, such as Miami-Fort Lauderdale.  Even if Sunbeam

15

could establish that despite its comparative advantages in the national market, Local People Meters are inferior to the Meter-Diary system in the Miami-Fort Lauderdale market—and the record does not provide an adequate basis to do so—Sunbeam has not adduced competent evidence to permit a jury to find that as a general matter, Local People Meters are inferior to the Meter-Diary system. And Nielsen has proffered expert testimony directly to the contrary. This then begs the question whether introduction of technology that may be superior to pre-existing technology on the national level can nonetheless constitute exclusionary conduct in those local markets in which the pre-existing technology may remain superior. The Court cannot accept such a proposition. A monopolist implementing a potentially superior product nationwide should not be held accountable in antitrust merely because implementation of that methodology into certain specific markets might qualify as exclusionary conduct were the methodology to prove inferior in a specific market.[5] To the extent that a product potentially superior in some markets underperforms in others, such harm should be viewed not as an exclusionary act, but as the antitrust injury resulting from some other form of anticompetitive conduct, if any can be established.

Sunbeam—unable to demonstrate that product change alone suffices under Section Two—tries to locate such anticompetitive conduct in alleged misrepresentations accompanying Local People Meter implementation. Sunbeam's theory is that were it not for misrepresentations regarding the quality of the technology and the ratings it produced, the market would have (1) demanded more product-testing and research, (2) discounted the value and significance of Sunbeam's ratings drop, and (3) been more hospitable to the introduction or development of a competing technology. Resolution of this issue must await supplemental briefing, which will address Sunbeam's factually parallel claim that such representations violated Florida's Deceptive and Unfair Trade Practices Act.

**B. Causation: Willing and Able Rivals**

In the absence of Eleventh Circuit precedent, this Court previously adopted the D.C. Circuit's standard governing what a purchaser must prove, in respect of showing the

---

[5] In fact, Sunbeam does not appear to be displeased with the Local People Meter ratings it has received from Nielsen for its Boston television station.

existence of an excluded competitor, to establish the causal nexus between exclusionary conduct and the plaintiff's antitrust injury:

> Just as a would-be entrant suing an incumbent firm for excluding it from a relevant market in violation of the Sherman Act must demonstrate it intended and was prepared to enter that market . . . , so a would-be purchaser suing an incumbent monopolist for excluding a potential competitor from which it might have bought a product at a lower price must prove the excluded firm was willing and able to supply it but for the incumbent firm's exclusionary conduct.

*Sunbeam Television Corp. v. Nielsen Media Research, Inc.*, No. 09-60637-CIV (PCH), 2010 WL 773581, *1 (S.D. Fla. March 5, 2010) (quoting *Meijer, Inc. v. Biovail Corp.*, 533 F.3d 857, 862 (D.C. Cir. 2008)).  Thus, to bring this controversy within the ambit of antitrust, Sunbeam must sufficiently establish that there existed a television viewership ratings firm willing and able to supply a superior product but for Nielsen's exclusionary conduct.   Sunbeam has suggested that there were three such excluded potential competitors: ADcom, erinMedia, and Arbitron.[6]

### 1. ADcom

The uncontroverted evidence demonstrates that ADcom neither sought nor intended to compete with Nielsen in the full-market television ratings business.  Instead, ADcom intended only to compete with Nielsen in a limited arena—the cable television ratings business.  *See* Dep. of Richard Spooner, Ex. 33, at 75:12-16 ("[W]e distinguished ourselves from day one as serving only one master.  You know that was a key component of our strategy.  We were not a broadcast or a full market measure.  We were a cable universe measure."); *Id.* at 84:15-22 ("[We] never ever had intention to go after the broadcast television market while ADcom was what ADcom was at that point.  What we would have done 10 or 15 years later . . . I don't really know what we would have done.").  Therefore, it cannot be said that ADcom was willing to supply full-market television ratings, as would be necessary to compete with Nielsen.

### 2. erinMedia

erinMedia, a company owned by real estate investor Frank Maggio, contemplated providing television ratings based in part on information acquired from in-home cable

---

[6] Although the Second Amended Complaint alleged additional excluded competitors—including Taylor Nelson Sofres, SRI, and Rentrak—Sunbeam has abandoned these on summary judgment.

boxes.[7]   Nielsen argues that erinMedia was not willing and able to provide local television ratings until it successfully established a national television ratings business, which it never did.   The evidence regarding erinMedia's willingness to provide such ratings is contradictory.   In support of its position, Nielsen cites a written "manifesto" issued by Maggio stating that "[t]here would be NO DISCUSSION about selling data and reports to the local marketplace.   This is something that erinMedia will discuss with the [cable operators] at a later date, once, and ONLY AFTER, the national marketplace is opened up to erinMedia to compete openly with Nielsen."   Ex. 42, at EM00025918 (emphasis in original).   Similar statements exist elsewhere.   However, as Sunbeam points out, these statements are tempered with other language indicating a definite intention to eventually enter the local ratings business, a possibility allegedly foreclosed by Nielsen's conduct.   *See* erinMedia October 2003 Business Plan, Ex. 221, at EM00019781 ("In the short run, erinMedia's strategy is not to become another Nielsen . . . Only after establishing a strong track record and creating a number of small yet viable revenue streams will erinMedia press to displace Nielsen in their core markets."); Maggio Aff. dated Oct. 12, 2010, Ex. 110, ¶ 6 ("Had erinMedia not been blocked from obtaining set top box data and ratings customers, erinMedia would have been generating ratings in and across various markets, including Miami.   I specifically intended to compete in providing local ratings for Miami."); erinMedia July 2002 Business Plan, Ex. 220, at EM00019671 ("Our strategy is to position our *entry* into areas where Nielsen does not provide services *or* is weak.") (emphasis added); *id.* at EM00019688 ("In this way, erinMedia can establish market credibility, trust in its research methodologies and a cash flow that will enable erinMedia to compete directly with Nielsen on local products.").   erinMedia's intention to compete is therefore a disputed issue of fact.

Another element of disagreement between the parties, particularly with regard to erinMedia, concerns the extent to which potential competition may be removed from actual competition yet still qualify as "willing and able."   The "willing and able" standard

---

[7] Cable boxes provide information on broadcast viewership to the extent that customers watch broadcast channels via their cable subscription, rather than receiving the broadcast signal by antenna.   However, such data is significantly incomplete, as it does not account for those viewers that do not receive television through cable, a distinct demographic group constituting as much as 30% of the national television market. *See* Dep. of Sara Erichson, Ex. 128, at 129:7-130:12.   In this regard, though the parties have not addressed the issue, the Court questions whether erinMedia's product is similar enough to Nielsen's—which measures total viewership—to qualify as a relevant competing product.

does not require that a firm be on the brink of competition with a monopolist. A successful illegal monopolist maintains its position by thwarting competition. Sometimes, that point occurs immediately prior to market entry, while in other cases, competition is neutralized sooner. Obviously, a monopolist should not be rewarded for eliminating competition in its incipiency. A firm with a viable business model and the intention to compete with the monopolist may be "willing and able," even if the monopolist succeeds in preventing that firm's ultimate ability to so compete in the relevant product market by precluding occurrence of some condition precedent to entry. *See U.S. v. Griffith*, 334 U.S. 100, 107 (1948) ("The anti-trust laws are as much violated by the prevention of competition as by its destruction."); *U.S. v. Microsoft Corp.*, 253 F.3d 34, 54 (D.C. Cir. 2001) ("Nothing in § 2 of the Sherman Act limits its prohibitions to actions taken against threats that are already well-developed enough to serve as present substitutes."); IIA Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 349 (3d ed. 2006) (noting that a nascent firm—*i.e.*, one that was never in the market but claims that it would have entered the market if not for the defendant's antitrust violation—"acquires standing by proving that it has the financial ability to enter the market, the background and experience that makes success possible, and that it has undertaken . . . significant steps toward entry").

While Sunbeam has adduced sufficient evidence of erinMedia's willingness, it has not done so with regard to erinMedia's ability to enter the market, or the allegedly anticompetitive reasons for that inability. It is undisputed that erinMedia did not obtain the cooperation of cable companies, whose set-top box data was essential to erinMedia's methodology. Sunbeam argues that this failure was the result of Nielsen having improperly fostered and exploited the cable companies' allegedly unfounded fear that providing erinMedia with the their customers' viewing data would run afoul of the federal Cable Act's privacy requirements and, if the practice were disclosed to third parties, draw the ire of the cable companies' customers. Nielsen denies having done so, and has presented evidence supporting its denial. In contrast, Sunbeam has not presented any competent evidence to establish that Nielsen caused the cable companies to withhold from erinMedia critical viewership data. According to Nielsen, and undisputed by Sunbeam, the best that Sunbeam proffered was a Nielsen representative's truthful

statement, made in response to a question asked during a public panel discussion on the subject, that there existed privacy concerns in the use of viewership set-top box data. This is patently insufficient to support Sunbeam's contention. Because erinMedia was unable to obtain the essential raw data for its methodology and because Sunbeam has not established that Nielsen caused this inability, a jury could not reasonably find that erinMedia was willing and able to compete with Nielsen. *See Meijer, Inc.*, 533 F.3d at 862 (drug manufacturer was not "able" to compete with incumbent where it could not demonstrate that it would have received necessary FDA approval).

### 3. Arbitron

There is clearly a material factual dispute about whether Arbitron is able to enter the local television ratings market. The record shows that Arbitron pioneered the use of Passive People Meter technology in the radio industry, and has extensive experience in the television ratings market, which it served for years in competition with Nielsen. However, Arbitron's willingness and intention to enter the relevant market are different matters. It is undisputed that in 1993 Arbitron abandoned the television ratings market to devote its resources exclusively to its dominant radio ratings enterprise and developing unique out-of-home television ratings. It is also undisputed that since then Arbitron has not pursued direct competition with Nielsen, nor has Arbitron stated a definitive intention to do so under any set of circumstances. The parties disagree as to why Arbitron has not elected to compete with Nielsen in the relevant market. Nielsen claims that Arbitron chose not to compete with Nielsen "in order to focus on radio ratings and measuring out-of-home television viewing." Mot. for Summ. J. at 10. Sunbeam contends that "Nielsen's reputation for retaliating . . . has caused Arbitron to avoid directly competing for Nielsen's core business." Sunbeam's Disputation ¶ 146.

It is remarkable that Sunbeam has not submitted any testimony from an Arbitron representative to support Sunbeam's contention that Arbitron was not only able but was willing to enter the television ratings market but for Nielsen's exclusionary practices. Sunbeam has submitted no evidence that Arbitron had taken even the first step, much less a significant step, toward entry into the market. Sunbeam has only presented a few vague, unexplained and somewhat contradictory Arbitron documents upon which it rests its assertion of Arbitron's willingness and intention to enter the market. *See* Arbitron

2009 Strategic Plan & 5-Year Projections, Ex. 62, at A00192587 ("Avoid head-to-head by emphasizing away-from-home and unique features."); *id.* ("Customer demand for Nielsen replacement . . . Economic pressures on TV stations creates opportunity for Arbitron."); *id.* at A00192604 ("The economic decline has prompted TV broadcasters to look aggressively at alternatives to Nielsen."); *id.* at A00192615 (characterizing Nielsen as the "Soviet Union"); Arbitron January 13, 2009 Television Offensive Strategy, Ex. 114, at A00001325 (noting that "Nielsen response is a risk"); 2010 *ARB-TV* Plan dated September 18, 2009, Ex. 115, at A00006995 ("Entering local TV is costly, and Nielsen will try to win back customers at any cost –customers may also be locked into long term contracts."). Sunbeam suggests that a jury could reasonably conclude from these unexplained, vague and contradictory documents that Arbitron is not only able but also willing to reenter the television ratings market. The Court finds that, on this record, such a conclusion would be unduly speculative and not supported by competent evidence. Therefore, this case does not present a disputed factual issue in regard to the existence of a willing and able competitor that would have entered the relevant market but for Nielsen's exclusionary practices.

## C. Antitrust Injury

According to Sunbeam, it has suffered two categories of damage as a result of Nielsen's exclusionary conduct: (a) supracompetitive prices paid for Local People Meter audience measurement services, and (b) loss in advertising revenue and going-concern value resulting from WSVN's precipitous and unwarranted drop in ratings. Even if Sunbeam were able to establish the existence of a "willing and able" competitor, which it has not, Sunbeam's damages would be limited to those arising from supracompetitive pricing.

Had Sunbeam sufficiently established the existence of such a competitor, the record would present a material factual dispute as to whether Nielsen's alleged contract staggering excluded that competitor from the market and permitted Nielsen to charge supracompetitive prices for its ratings data. The record would not, however, permit the issue of lost advertising revenue or reduced going-concern value to reach the jury. This is because Sunbeam is unable to prove these alleged damages. Even if another competitor would have entered the Miami-Fort Lauderdale market, it must be shown that

the competitor would have introduced a superior technology (at least from Sunbeam's perspective) which would have properly allocated to Sunbeam's WSVN a larger percentage of viewership than does the Local People Meter method. The record establishes that Sunbeam is unable to make such a showing.

In considering this damage issue, the Court is once again mindful of an underlying and ever-present tension operating in this case. The imprecise and subjective craft of rating television viewership is, in an important respect, a zero-sum activity. Regardless of which contending rating methodology is selected, the universe of viewership to be allocated among all competing television stations is 100%. Thus, it is self-evident that when one station's allocation of viewership increases, the remaining percentage allocated to the other stations decreases proportionally. The Court is also mindful, and both parties agree, that any audience measurement system that relies on sampling is bound to be imperfect. With these considerations in mind and based on the record, the Court has determined that Sunbeam cannot meet the initial burden of establishing that WSVN's current ratings are less accurate than they would be under a prospective competitor's methodology. More importantly, even if Sunbeam could meet this initial burden, Sunbeam has not established that the improved accuracy would inure to its benefit, *i.e.*, that WSVN would be allocated a greater percentage of viewership under that competitor's methodology.[8] In fact, Sunbeam has candidly admitted its inability to do so. *See* Pl.'s Surreply Mem. in Opp'n to Nielsen's Mot. for Summ. J. (D.E. # 154), at 2 ("The only way to determine the impact of these problems on ratings accuracy, and to adequately address them, is to conduct rigorous methodological research . . . Only Nielsen can conduct such research"). Neither Sunbeam's corporate executives nor its experts were willing to testify that Local People Meters were inferior to the pre-existing Diary or Meter-Diary methods. Not only were experts unwilling to explicitly address superiority, none has conducted any independent testing or sampling that would suggest more accurate ratings and, more importantly, that such ratings would benefit Sunbeam. A jury cannot reasonably find what Sunbeam and its experts cannot establish.

---

[8] Ironically, Frank Maggio of erinMedia, which figures so prominently in Sunbeam's discussion of excluded competitors, testified that it was cable television stations' viewership, not broadcast stations' viewership (including WSVN's), which was underrated by Nielsen's methodology, and that erinMedia's methodology would properly reallocate a greater viewership percentage to the cable stations. *See* Dep. of Frank Maggio, Ex. 37, at 35:10-16.

For years, Sunbeam was pleased with the status quo of the Meter-Diary method, which even Sunbeam admits has flaws, but other stations, including cable stations, were not.  Now some of those other stations may be satisfied, and Sunbeam is not.  Were Nielsen to be compelled to revert to the Meter-Diary method or institute a new method entirely, it would likely face new complaints and possibly new antitrust actions from other stations, cable or broadcast, dissatisfied with their decreased allocation.  This precarious position does not mean that Nielsen should be immune from some suit.  The law does require, however, that Sunbeam present a triable issue of damages and, as to lost ad revenue and going-concern value, it cannot do so without undue speculation.[9]

### Conclusion

Though there is evidence of exclusionary contracting practices, Sunbeam has not established the existence of a "willing and able" competitor.  Accordingly, the Motion for Summary Judgment must be granted as to the federal and state antitrust claims.

DONE and ORDERED in Chambers, Miami, Florida, January 13, 2011.

Paul C. Huck
United States District Judge

Copies furnished to:
Counsel of Record

---

[9] Even if Sunbeam establishes a jury issue regarding alleged misrepresentations surrounding implementation of the Local People Meters—a matter which must await supplemental briefing—its antitrust claim would fail for lack of a "willing and able competitor," and even if its claim did not so fail, its antitrust injury would still be limited to supracompetitive prices, for Sunbeam would face the same constraints here outlined in establishing any other form of damage.